# AUTOMATED CLEARING HOUSE PROCESSING AGREEMENT

| Reseller's Name: | | |
|---|---|---|
| CHECK COMMERCE USE ONLY BELOW: | | |
| Merchant ID: | Entered By: | Date: |

| **I. MERCHANT INFORMATION:** | | | |
|---|---|---|---|
| Federal Tax ID Number: | | State Tax ID Number: | |
| Business Name: | | DBA: | |
| Address: | City: | State: | Zip Code: |
| Telephone Number: | | Fax Number: | |
| Primary Email: | | Website Address: | |

| **II. PRINCIPAL / INDIVIDUAL 1** | | | | |
|---|---|---|---|---|
| Name: | Title: | % of Ownership: | Driver's License #: | State: |
| Address: | City: | | State: | Zip Code: |
| Residence Phone: | Social Security Number: | | Date of Birth: | |

| **II. PRINCIPAL / INDIVIDUAL 2** | | | | |
|---|---|---|---|---|
| Name: | Title: | % of Ownership: | Driver's License #: | State: |
| Address: | City: | | State: | Zip Code: |
| Residence Phone: | Social Security Number: | | Date of Birth: | |

| **III. FEES** | | | |
|---|---|---|---|
| Per Transaction / Per Settlement: | Per Return / Per Exception: | Discount Rate: | Authentication Fee: |
| Monthly Maintenance Fee: | Per Chargeback: | Application Fee: | Collections Service Fee: |
| Quarterly Compliance Fee: **$24.95** | Early Termination Fee: **$500.00** | Proof of Authorization (POA) Fee: **$10.00** | Other: |

| **IV. RETURN THRESHOLDS [CHECK COMMERCE USE ONLY]** | | |
|---|---|---|
| Administrative Returns | 2% | Closed Account, Invalid Account, No Account Found |
| Standard Returns | 2% | All Positive Value Items, Excluding High Risk |
| High Risk Returns | 0.5% | Customer Advises Not Authorized, Authorization Revoked, Stop Payment, Returned Per ODFI's Request |
| **Total** | **4.5%** | |

| **V. REQUESTED TRANSACTION VOLUME** | | |
|---|---|---|
| Maximum Single Transaction Amount: $ | Maximum Daily Dollar Amount: $ | Maximum Daily Number of Transactions: |

| **VI. TRADE REFERENCES** | | | |
|---|---|---|---|
| Company Name: | Contact Person: | Telephone Number: | Business Type: |
| Company Name: | Contact Person: | Telephone Number: | Business Type: |

| **VII. BANK REFERENCES** | | | |
|---|---|---|---|
| Company Name: | Contact Person: | Telephone Number: | Business Type: |
| Company Name: | Contact Person: | Telephone Number: | Business Type: |



**SCHEDULE - A:   ACH AGREEMENT TERMS AND CONDITIONS**

**1.0**   These ACH Agreement Terms and Conditions ("Agreement") govern the agreement between the company ("Merchant") named on any ACH processing Application ("Application") and ACH Processing Agreement to which these Terms and Conditions are attached and Check Commerce ("CHECK COMMERCE"). Merchant agrees to be bound by the terms of this Agreement as stated herein.  Each of the individuals signing this Agreement and the Application represents and warrants that he or she has the full power and authority to bind the party (Merchant) identified above his or her name.

**1.1   ACH PROCESSING.**   CHECK COMMERCE and Merchant have contracted for CHECK COMMERCE to provide Automated Clearing House ("ACH") services as a Third Party Processor of ACH transactions.   These transactions will be placed through a financial institution used by CHECK COMMERCE who will be acting as the Originating Depository Financial Institution ("ODFI"). Merchant shall act as the Originator.   CHECK COMMERCE will debit funds ("Debit Entry") for the purpose of collecting Automatic Payments from the accounts of the Merchant's customers ("Receivers") and/or credit funds ("Credit Entry") for the purpose of paying the Merchant's accounts receivable in accordance with the terms of this Agreement, the Operating Rules ("Rules") of the National Automated Clearing House Association ("NACHA"), and applicable federal, state and local laws or regulations governing ACH transactions (collectively, "Regulations").   The terms and conditions of this Agreement do not limit Merchant's obligation to comply with the Rules and Regulations.   "Entry" or "Entries" shall mean either a Credit Entry or a Debit Entry.

**1.2   ACCOUNT AND AUTHORIZATION.**   Merchant shall, at all times, maintain an account at a bank that is a member of the Federal Reserve ACH System ("Account"). Merchant expressly authorizes CHECK COMMERCE to debit and/or credit the Account designated by Merchant according to the terms of this Agreement.  Merchant further authorizes CHECK COMMERCE to process electronic funds transfers as a Third Party Processor through the Account designated by Merchant.  Merchant represents and warrants that it shall, at all times, maintain a sufficient balance in the Account to cover all obligations owed to CHECK COMMERCE, including, but not limited to, all Entries originated by Merchant, returned Entries, chargebacks, fees, fines and all other obligations owed to CHECK COMMERCE and Merchant authorizes CHECK COMMERCE to debit its Account for all amounts owed to CHECK COMMERCE.  Merchant acknowledges and expressly agrees that this authorization applies with the same force and effect to any new bank account information for Merchant that CHECK COMMERCE obtains at a future date, regardless of the timing, reason or manner in which CHECK COMMERCE obtains information about other bank account(s) for Merchant (including, but not limited to, bank account(s) that Merchant identifies to CHECK COMMERCE or bank account(s) for Merchant that CHECK COMMERCE identifies through its own lawful research or investigation), and Merchant expressly agrees that CHECK COMMERCE may debit any such account held by, or on behalf of Merchant, in order to satisfy any of Merchant's obligations to CHECK COMMERCE.  Merchant shall provide new Account information to CHECK COMMERCE, in writing, at least 10 days prior to closing or changing the Account designated in this Agreement.  This authorization shall survive the termination of this Agreement and shall continue in perpetuity until all of Merchant's obligations to CHECK COMMERCE are paid in full, including, but not limited to, those obligations described in this Agreement.

**1.3   CANCELLATION.**   Either party may cancel this Agreement with 30 days' written notice to the other party, subject to the terms and limitations set forth in the TERM AND TERMINATION paragraph of this Agreement, including, without limitation, Merchant's obligation to pay an Early Termination Fee if CHECK COMMERCE does not approve, in writing, Merchant's request to terminate the Agreement before the expiration of the initial term or any renewal term. CHECK COMMERCE may also immediately cancel this Agreement and immediately suspend all processing for Merchant without providing advance written notice to Merchant: (1) upon the request of CHECK COMMERCE'S ODFI or any regulatory agency, regardless of the reason for the request; (2) if CHECK COMMERCE, its ODFI or any regulatory agency believes that Merchant has breached this Agreement, has breached any representations and warranties made in this Agreement, is violating or has previously violated any applicable Rules or Regulations and/or has initiated any unauthorized Entries; or (3) if CHECK COMMERCE is unable to process transactions for Merchant for any reason that is out of CHECK COMMERCE'S control or CHECK COMMERCE no longer has the ability to process transactions for Merchant.

**1.4   CONSUMER CREDIT INQUIRIES.**   A credit report may be made in connection with this Application and Agreement.  Merchant and the individuals signing this Agreement on behalf of the Merchant, including any Guarantors, authorize CHECK COMMERCE, or any credit bureau or any credit reporting agency employed by CHECK COMMERCE or any agents of CHECK COMMERCE to investigate the references provided or any other statements or data obtained from the Merchant, or any of the above principals, for the purpose of this Application and Agreement. Merchant also authorizes CHECK COMMERCE to obtain additional credit reports regarding Merchant on an annual basis, unless CHECK COMMERCE, in its sole and absolute discretion, determines that it is necessary for CHECK COMMERCE to periodically obtain Merchant's credit report on a more than annual basis, in which case Merchant authorizes CHECK COMMERCE to obtain such additional credit reports.  Notwithstanding anything in this paragraph, Merchant authorizes CHECK COMMERCE to obtain a credit report regarding Merchant if Merchant requests increased processing amounts or parameters, or if Merchant originates sporadic transactional volume.

**2.0   MERCHANT RESPONSIBILITIES**

**2.1   AUTHORIZATION.**   Merchant agrees to obtain authorization from Receivers pursuant to the requirements of the Rules and applicable Regulations prior to debiting and/or crediting Receivers' accounts.   Merchant will maintain copies of the authorizations for a period of 2 years from the termination or revocation of the authorization.

**2.2   AUTHENTICATION.**   Merchant agrees that CHECK COMMERCE may adjust processing fees and/or add authentication services without prior notice if Merchant experiences a return rate outside the standard return rates for its industry, as determined by CHECK COMMERCE in its sole and absolute discretion, or if CHECK COMMERCE deems the authentication process Merchant subscribes to is not adequate for standards determined by CHECK COMMERCE. CHECK COMMERCE at its sole and absolute discretion will determine the standards of authentication and the rate of return acceptable for Merchant.   Nothing herein limits the Merchant's obligation to comply with the Rules and all applicable Regulations.

**2.3   REPRESENTATIONS REGARDING AUTHORIZATION.**   Merchant represents and warrants with respect to all Entries originated by Merchant and processed by CHECK COMMERCE for Merchant that (1) each Receiver has authorized the debiting and or crediting of its account, (2) each Entry is for an amount agreed to by the Receiver, and (3) each Entry is in all other respects properly authorized.   In addition to all other indemnity obligations contained elsewhere in this Agreement, Merchant agrees to defend, indemnify and hold harmless CHECK COMMERCE for any claims, losses, liabilities, costs or expenses suffered or incurred (including



attorneys' fees and costs) relating to, arising out of or involving any breach of these representations and warranties or unauthorized Entries. These representations and warranties by Merchant shall survive termination of the Agreement. Merchant acknowledges and agrees that, from time to time, another person or entity may submit or modify transactions on behalf of the Merchant, including, without limitation, owners, principals, employees, officers, accountants or other designated third parties.  Such a person or entity is referred to herein as a "Merchant Administrator."  Merchant expressly agrees that CHECK COMMERCE is also considered a Merchant Administrator.  Merchant agrees that all actions of a Merchant Administrator will be deemed to be actions by Merchant under this Agreement, and Merchant accepts full responsibility and liability for any and all acts and/or omissions of a Merchant Administrator, including, but not limited to, acts of negligence (whether active, passive or gross negligence) and intentional or fraudulent acts.

**2.4   IDENTIFYING NUMBERS.**   Merchant understands and agrees that CHECK COMMERCE may rely solely on identifying numbers provided by Merchant to determine the bank and account of a Receiver even if the numbers identify a bank or account holder different from the one identified by Merchant.  In addition to all other indemnity obligations contained elsewhere in this Agreement, Merchant shall defend, indemnify and hold harmless CHECK COMMERCE for any claims, losses, liabilities, costs or expenses suffered or incurred (including attorneys' fees and costs) as a result of an incorrect account or other identification.

**2.5   INTENTIONALLY OMITTED.**

**2.6   REGULATORY COMPLIANCE.**   Merchant bears the final responsibility to insure that Merchant's policies and procedures meet the requirements of the Rules and all applicable Regulations.  Merchant is encouraged to consult counsel regarding compliance with the Rules and Regulations whenever there is any doubt about compliance. Merchant represents and warrants that all Entries originated by Merchant and processed by CHECK COMMERCE for Merchant comply with all applicable Rules and Regulations, including without limitation the following Regulations: 1) FTC Act (15 U.S.C. §§ 41, et seq.); 2) TSR (16 C.F.R. 310, et seq.); 3) Electronic Fund Transfer Act (15 U.S.C. §§ 1601, et seq.) and Regulation E (12 C.F.R 205, et seq.), if applicable; 4) Uniform Commercial Code Article 4-A, if applicable; 5) Federal Reserve Board Regulation J, if applicable; 6) the rules and sanctions laws of the Office of Foreign Assets and Control ("OFAC"); 7) Unlawful Internet Gambling Enforcement Act (31 U.S.C. §§ 5361, et seq.) and accompanying regulations (12 C.F.R. 233; 31 C.F.R. 132); 8) PACT Act (15 U.S.C. §§ 376, et seq., Jenkins Act (15 U.S.C. §§ 375, et seq. and accompanying regulations; and  9) all applicable state laws and regulations.  Merchant further represents and warrants that it shall not originate any Entries that constitute (i) improper telemarketing in violation of the TSR or other applicable Regulations or Rules; (ii) sales or marketing of advance-fee credit cards in violation of the TSR or other applicable Regulations or Rules; (iii) restricted Internet gambling transactions; and/or (iv) unlawful Internet tobacco sales.  Merchant represents and warrants that it will not transmit any Entries that violate the laws of the United States or any state or locality in which CHECK COMMERCE or Merchant does business.  These representations and warranties by Merchant shall survive termination of this Agreement.  In addition to all other indemnity obligations contained elsewhere in this Agreement, Merchant shall defend, indemnify and hold harmless CHECK COMMERCE for any claims, losses, liabilities, costs, fines or expenses suffered or incurred (including attorneys' fees and costs) relating to, arising out of or involving any breach of these representations and warranties or failure to comply with any applicable Rules or Regulations. In addition to its cancellation rights described elsewhere in this Agreement, CHECK COMMERCE may immediately cancel this Agreement if CHECK COMMERCE, its ODFI or any regulatory agency believes that Merchant is violating or has previously violated any applicable Regulation or Rule or is in breach of these representations and warranties.

**2.7   TAX NAME AND ID.**   Merchant shall provide to CHECK COMMERCE its correct and accurate tax filing name and tax identification number for the U.S. Internal Revenue Service ("IRS"). In addition to all other indemnity obligations contained elsewhere in this Agreement, Merchant bears all liability and agrees to defend, indemnify and hold harmless CHECK COMMERCE and its ODFI, including all of their directors, officers, employees and affiliates, from any and all claims, liabilities, losses, damages, fines, costs or other expenses (including attorneys' fees and costs) suffered or incurred arising out of, relating to or involving in any way Merchant's failure to provide an accurate tax filing name or tax identification number.

**2.8   TAX REPORTING OBLIGATIONS.**   Merchant acknowledges that, pursuant to Section 6050W of the Internal Revenue Code, CHECK COMMERCE is responsible for filing with the IRS annual information returns for all reportable payment transactions to Merchant for whom CHECK COMMERCE processes transactions under this Agreement.  Merchant shall cooperate with CHECK COMMERCE and take all reasonable steps to aid its reporting obligations and compliance with Section 6050W, including, but not limited to, provide an accurate and verifiable tax filing name and tax identification number ("TIN") for each Merchant account.  Merchant further acknowledges and agrees that, if it fails to provide an accurate tax filing name or TIN information, the IRS notifies CHECK COMMERCE of a discrepancy between the information provided by Merchant and the IRS records, or if requested by the IRS for any reason, CHECK COMMERCE shall be required to perform backup withholding from Merchant funding by deducting and withholding income tax in an amount based on the IRS withholding regulations at the time withholding is required from the gross amount of each reportable transaction pursuant to Section 6050W and its corresponding regulations.  Merchant expressly authorizes CHECK COMMERCE to withhold from Merchant's funding or debit Merchant's Account (or another account designated by Merchant if there are insufficient funds in the Account to cover the required withholding) for any and all backup withholding amounts required by Section 6050W and its corresponding regulations.

**2.9   RECORDKEEPING REQUIREMENTS.**   Merchant shall keep all records of verifiable consumer authorizations for a period of two (2) years from the date an authorization is terminated or revoked. Merchant agrees to provide copies of such documents or records to CHECK COMMERCE immediately upon written request from CHECK COMMERCE.

**2.10   NOTICE OF ERRONEOUS UNAUTHORIZED TRANSFER.**   Merchant agrees to promptly and regularly review all Entries and other communication received from CHECK COMMERCE and to immediately notify CHECK COMMERCE if there are any discrepancies between Merchant's records and those provided by CHECK COMMERCE, the ODFI or Merchant's bank, or with respect to any transfer not authorized by Merchant.  If Merchant fails to notify CHECK COMMERCE within 7 days of the date CHECK COMMERCE e-mails, mails or otherwise provides a statement of account or other report of activity to Merchant, then Merchant will be solely responsible for all losses or other costs associated with any erroneous or unauthorized transfer.

**2.11   INDEMNITY.**   In addition to all other indemnity obligations contained elsewhere in this Agreement, Merchant agrees to defend, indemnify and hold harmless CHECK COMMERCE and its ODFI, including all of their directors, officers, employees and affiliates, from and against any and all claims, losses, liabilities, costs or expenses suffered or incurred (including attorneys' fees and costs) relating to, arising out of or involving any breach of the representations and warranties made by Merchant in this Agreement, the failure of Merchant or a Merchant Administrator to comply with the terms of the Agreement, the failure of Merchant or a Merchant Administrator to comply with the Rules, or any and all other applicable laws or Regulations, or by reason of CHECK COMMERCE providing the services set forth in this Agreement.  This paragraph shall survive termination of the Agreement.



V10.10.19    ACH PROCESSING AGREEMENT    3

**3.0 CHECK COMMERCE RESPONSIBILITIES**

**3.1 ACCEPTING TRANSACTIONS.** CHECK COMMERCE will only be responsible for processing Entries that have arrived at its premises in proper format and on a timely basis.  CHECK COMMERCE will advise Merchant of any applicable cut-off time.  Merchant does not have the right to cancel or amend any entry after submission to the ACH Network.

**3.2 ORIGINATING TRANSACTIONS.** CHECK COMMERCE will use the information provided by Merchant to originate Entries to the ACH Network.  Merchant acknowledges and agrees that CHECK COMMERCE may reject Entries for any reason permitted or required by the Rules or applicable Regulations.  Merchant also acknowledges and agrees that Entries or files may be rejected which exceed the threshold parameters identified and set for Merchant.  Merchant also acknowledges and agrees that an Entry may be rejected if the Entry would cause CHECK COMMERCE to violate any Federal Reserve or other regulatory risk control program, any other applicable Rule or Regulation, or CHECK COMMERCE'S agreement with its ODFI.  At Merchant's request, CHECK COMMERCE will make reasonable efforts to reverse, modify, or delete an Entry, but will have no responsibility for the failure to comply with that request.  All such requests must be made in writing and faxed, delivered, or mailed to CHECK COMMERCE.

**3.3 RETURNED ENTRIES AND NOCS.** CHECK COMMERCE will apply returned Entries to Merchant's Account when they are received.  As described elsewhere in this Agreement, if Merchant does not have funds available in its designated Account sufficient to cover all returned Entries, Merchant acknowledges and agrees that CHECK COMMERCE will debit any other bank account identified by Merchant to CHECK COMMERCE (regardless of the timing, method or reason Merchant identified such account to CHECK COMMERCE).  CHECK COMMERCE will create and make available to Merchant a report containing detailed information about returned Entries.  If Merchant requests that the returned Entries be provided electronically, CHECK COMMERCE may do so according to the Rules and Regulations regarding returned Entries.  Merchant is solely responsible for all returned Entries.

**3.4 SETTLEMENTS AND FINALITY.** Merchant's Account will settle in accordance with the funding schedule set for Merchant. The first day of the settlement cycle is the following day from the effective Entry date. If any Entry is returned beyond the settlement date, CHECK COMMERCE will, at CHECK COMMERCE's sole and absolute discretion, either apply the debit to the current day's settlement, or debit the Merchant's account for the amount of the returned Entry plus associated fees. If sufficient funds to cover returned Entries are not available in Merchant's Account, Merchant shall immediately remit payment to CHECK COMMERCE to fully cover the amount of all returned Entries. As described elsewhere in this Agreement, Merchant agrees that, to fully cover all returned Entries, CHECK COMMERCE may also debit any other bank account for Merchant about which it has account information, regardless of the timing, reason or manner in which CHECK COMMERCE obtained information about the other bank account(s) for Merchant (including, but not limited to, bank account(s) that Merchant identifies to CHECK COMMERCE or bank account(s) for Merchant that CHECK COMMERCE identifies through its own lawful research or investigation).

**3.5 NO WARRANTY.** Merchant acknowledges and agrees that neither CHECK COMMERCE nor its ODFI has control over the conditions under which Merchant uses the payment processing system, and does and cannot warrant the results obtained by such use. **CHECK COMMERCE DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, RELATING TO THE PROCESSING AND/OR CHECK COMMERCE'S SERVICES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES AGAINST INFRINGEMENT OF THIRD-PARTY RIGHTS OR THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.  CHECK COMMERCE DOES NOT WARRANT THAT OPERATION OF THE PAYMENT PROCESSING SERVICE WILL BE UNINTERRUPTED, ERROR-FREE, OR SECURE. MERCHANT ACKNOWLEDGES THAT THE PAYMENT PROCESSING SYSTEM IS PROVIDED FOR USE BY MERCHANT "AS IS."  MERCHANT FURTHER ACKNOWLEDGES THAT CHECK COMMERCE BEARS NO RESPONSIBILITY FOR THE MERCHANT WEB SITE(S). MERCHANT ACKNOWLEDGES THAT AN AUTHORIZATION FOR PAYMENT IS NEITHER A WARRANTY THAT THE PERSON PRESENTING THE AUTHORIZATION IS THE RIGHTFUL ACCOUNT HOLDER NOR A PROMISE OR GUARANTEE BY CHECK COMMERCE THAT IT WILL PAY OR ARRANGE FOR PAYMENT TO MERCHANT FOR THE AUTHORIZED TRANSACTION. MERCHANT ACKNOWLEDGES THAT AN AUTHORIZATION DOES NOT PREVENT A SUBSEQUENT REVERSAL OF A PREVIOUSLY AUTHORIZED TRANSACTION PURSUANT TO THIS AGREEMENT.**

**3.6 LIMITS OF LIABILITY.** CHECK COMMERCE will be responsible for the performance of ACH services as a Third Party Processor in accordance with the terms of this Agreement and the Rules and applicable Regulations.  CHECK COMMERCE will not accept responsibility for errors, acts, or failure to act by others, including but not limited to, banks, communication providers, common carriers, or clearing houses through which Entries may be passed and or originated.  CHECK COMMERCE is not responsible for any loss, liability or delay caused by fires, earthquakes, war, civil disturbances, power surges or failures, acts of governments, labor disputes, failures in communication networks, intervening negligent, criminal or tortious acts of third parties who are not within CHECK COMMERCE'S control or employ, legal constraints or other events beyond the control of CHECK COMMERCE. CHECK COMMERCE shall not be liable to Merchant for any delays in receipt or transmittal of funds or errors in credit or debit entries caused by third parties, including, without limitation, the Automated Clearing House, any depository financial institution, or any agent of Merchant.

**4.0 ADDITIONAL TERMS AND CONDITIONS**

**4.1 FEES AND PAYMENT.** CHECK COMMERCE will notify Merchant in writing of fees due for services rendered.  Notice of any changes to the existing fee structure as stated in this Agreement (including new or increased fees) will be made in writing to Merchant within 10 days of such changes or any new fees becoming effective.  Merchant has the right to cancel the Agreement in writing at that time.  Continued use of the services provided by CHECK COMMERCE after notice of fee changes is provided to Merchant shall constitute Merchant's agreement to any new or changed fees.  In addition to the fees identified elsewhere in this Agreement and the Application, Merchant shall pay the fees to CHECK COMMERCE set forth in this paragraph. **Return Fees:** If Merchant returns a transaction initiated by CHECK COMMERCE and the transaction is in accordance with this Agreement, Merchant will be charged a $35.00 return fee per occurrence.  CHECK COMMERCE, in its sole and absolute discretion, may suspend settlements for Merchant until payment for returned Entries or return fees is fully remedied. **Chargeback and High Return Rate Fees:**  If, at the time Merchant is billed for chargebacks, Merchant's High Risk or Unauthorized Return Rate exceeds 0.5% using a NACHA approved method of calculation, a high-risk surcharge of $15.00 will be added to each chargeback received during that billing period and an additional 1.0% discount rate will be added to Merchant's Account, to be charged retroactively for the previous 30 days.  In addition, if Merchant's overall return rate exceeds the rate specified in this Agreement, Merchant will be charged an additional $5.00 per return until such time that the Merchant's return rate returns to a level that is below the return rate threshold specified in this Agreement or Merchant is approved for a higher return limit. **Proof of Authorization Fees:**  Merchant will be charged a $10.00 fee



for each Proof of Authorization ("P.O.A.") request received by CHECK COMMERCE.  Merchant agrees to provide CHECK COMMERCE with the P.O.A. and all required information by the deadline imposed by CHECK COMMERCE.  If CHECK COMMERCE does not receive the P.O.A. and/or any other required documentation within the time permitted and/or Merchant does provide information but the information provided is not valid or does not meet the NACHA requirements for the type of transaction that is in question, Merchant agrees to pay $35.00 for each occurrence. **Refunds and Credits:**  CHECK COMMERCE reserves the right to issue refunds or credits to any Receiver that has been debited by Merchant at any time and in CHECK COMMERCE'S sole and absolute discretion.  Merchant is subject to a $25.00 fee per credit or refund issued.  In the event CHECK COMMERCE issues any credits or refunds on behalf of the Merchant, the amount of the refund or credit and associated fees will be deducted from Merchant's Account.  If there are not sufficient funds in the Account, Merchant agrees that CHECK COMMERCE will deduct the amount of refunds or credits issued, as well as associated fees, from Merchant's Reserve Account or may debit any other bank account for Merchant about which CHECK COMMERCE has account information, regardless of the timing, reason or manner in which CHECK COMMERCE obtained information about the other bank account(s) for Merchant (including, but not limited to, bank account(s) that Merchant identifies to CHECK COMMERCE or bank account(s) for Merchant that CHECK COMMERCE identifies through its own lawful research or investigation). **Transactional Limit Fees:**  CHECK COMMERCE will also impose fees in the event Merchant exceeds any of its imposed maximum single transaction and maximum daily dollar limits.  Daily limits will be reset at the beginning of each day. For single transaction and daily dollar amount limits, a $25.00 fee per transaction that exceeds the limits will be applied. **Compliance Fees:**  Merchant agrees that, for each Merchant account on file with CHECK COMMERCE, Merchant will pay a compliance fee of $24.95 to be billed per quarter. **Attorneys' Fees.** If Merchant becomes obligated to pay CHECK COMMERCE's attorneys' fees pursuant to any provision in of this Agreement, such fees shall include in-house counsel fees at the rate of $400 per hour, as well as the actual hourly rate for outside counsel. **Payment:**  Merchant agrees that CHECK COMMERCE may collect any and all amounts due by Merchant, including, without limitation, all fees set forth in the Application and this Agreement, returned Entries, chargebacks, refunds or credits issued to Receivers, fines, damages or costs and expenses incurred by CHECK COMMERCE to perform services for Merchant (including attorneys' fees and costs to enforce any of Merchant's obligations under this Agreement), by billing Merchant, debiting Merchant's Account, debiting the Reserve Account or debiting any other bank account for Merchant about which CHECK COMMERCE obtains account information, regardless of the timing, reason or manner in which CHECK COMMERCE obtained information about the other bank account(s) for Merchant (including, but not limited to, bank account(s) that Merchant identifies to CHECK COMMERCE or bank account(s) for Merchant that CHECK COMMERCE identifies through its own lawful research or investigation), and/or setting off against any amounts CHECK COMMERCE owes Merchant, without any obligation to give prior notice to Merchant.  Merchant shall provide CHECK COMMERCE the information necessary to collect all amounts owed by Merchant under this Agreement or the Rules or applicable Regulations.  Merchant will be responsible for any and all attorneys' fees and other costs and expenses CHECK COMMERCE may incur in collecting any fees or other amounts Merchant owes to CHECK COMMERCE.

**4.2   VOLUME ANALYSIS.**  CHECK COMMERCE will routinely analyze Merchant origination and return activity.  In the event Merchant exceeds a return rate outside the standard return rates for its industry, as determined by CHECK COMMERCE in its sole and absolute discretion, CHECK COMMERCE determines Merchant's business is operating in a manner that CHECK COMMERCE believes could cause a financial or legal risk, or if Merchant ceases to do business with CHECK COMMERCE for any reason, CHECK COMMERCE shall have the right at any time to place all of the provisional or final credit provided to Merchant for each Debit Entry originated by it into an account held by CHECK COMMERCE for a period of 2 years from the last Debit Entry.  The above determining factors are at the sole and absolute discretion of CHECK COMMERCE.  In addition to all other Merchant accounts from which CHECK COMMERCE is authorized under this Agreement to obtain payment of funds owed by Merchant, CHECK COMMERCE shall have the right to offset and pay itself from the account described in this paragraph for all returned Entries, chargebacks, refunds or credits issued, fees, damages (including liquidated damages), or other costs and expenses (including attorneys' fees and costs) that may arise out of ACH processing for Merchant and for which Merchant has agreed to pay CHECK COMMERCE pursuant to the terms of this Agreement. Additionally, if the Merchant's average transaction volume drops by more than 75% or Merchant processes less than 75% of the projected volume set forth in the Requested Transaction Volume section in the Application, CHECK COMMERCE may increase Merchant's fees without prior notice to Merchant.

**4.3   LIQUIDATED DAMAGES.**  Notwithstanding any other provision of this Agreement, in the event that Merchant violates any applicable Regulation or Rule, or is in breach of the representations and warranties made in this Agreement regarding Merchant's compliance with all applicable Regulations and Rules, Merchant shall pay to CHECK COMMERCE as liquidated damages an amount equal to 30% of the provisional or final credit for each Debit Entry that may otherwise be provided to Merchant at the conclusion of the 2-year VOLUME ANALYSIS period.  Merchant acknowledges and agrees that CHECK COMMERCE may deduct the amount of liquidated damages owed pursuant to this paragraph from the amount of provisional or final credit that may otherwise be provided to Merchant at the conclusion of the 2-year VOLUME ANALYSIS period.  The parties agree that CHECK COMMERCE'S damages for Merchant's violation of any applicable Regulation or Rule, or breach of Merchant's representations and warranties regarding Merchant's compliance with all applicable Regulations and Rules, would be uncertain and difficult to ascertain and that the liquidated damages described in this paragraph are reasonably related to CHECK COMMERCE'S actual damages and are a reasonable estimate of the damages which CHECK COMMERCE would in fact suffer in the event Merchant's failure to comply with all applicable Regulations and Rules, or Merchant's breach of its representations and warranties regarding its compliance with applicable Regulations and Rules and that such Liquidated Damages are not a penalty.

**4.4   CONFIDENTIALITY.**  Each party represents, warrants and mutually agrees that all information concerning the other party which comes into its possession during the term of this Agreement shall be maintained as confidential and shall not be used or divulged to any other party except as necessary to permit the activities contemplated under this Agreement or as required by law. Notwithstanding the foregoing, it shall not be a breach of this Confidentiality provision for CHECK COMMERCE to disclose Merchant's confidential information if required to do so under law or in a judicial or other governmental investigation or proceeding, provided Merchant has been given prior notice to the extent not prohibited or requested by the government agency or Court Order and CHECK COMMERCE has sought all available safeguards against widespread dissemination prior to such disclosure.

**4.5   GOVERNING LAW AND VENUE.**  This Agreement, all questions related to the Agreement's validity, interpretation, performance, execution and inducement, and all claims related to, arising under, or involving in any way this Agreement, the services by CHECK COMMERCE, or Merchant's business relationship with CHECK COMMERCE, or Merchant's business relationship with CHECK COMMERCE are governed by, and shall be construed under, the laws of the State of Arizona without regard for the principles and conflicts of law. All such claims shall exclusively be adjudicated in a State or Federal Court located in Maricopa County, Arizona, which the parties agree has exclusive personal jurisdiction over them and is the proper venue. The parties waive any objections to personal jurisdiction or venue in Maricopa County, Arizona. The prevailing party in any such action shall be entitled to recover its reasonable attorneys' fees and costs (including expert witness fees and costs) incurred in the matter.



**4.6  JURY TRIAL WAIVER.**  CHECK COMMERCE AND MERCHANT BOTH IRREVOCABLY WAIVE A TRIAL BY JURY UNDER BOTH STATE AND FEDERAL LAW IN ANY ACTION, LAWSUIT, OR DISPUTE ARISING OUT OF, OR RELATING TO, THIS AGREEMENT, CHECK COMMERCE'S SERVICES, OR THE TRANSACTIONS RELATING TO SUBJECT MATTER OF THIS AGREEMENT.

**4.7  AGREEMENT MODIFICATION**.  CHECK COMMERCE may modify the terms and conditions of this Agreement upon 10 days' written notice. Use of services after any such modification will evidence acceptance of the modification(s).

**4.8  NOTICES.**  Each notice required by this Agreement shall be in writing and will be effective when sent unless notice is provided by First Class Mail, return receipt requested, which shall be effective when received. Notice may be provided by:

(1)  To Merchant:
   (a)  by First Class Mail, return receipt requested, at the Merchant's business address listed in this Agreement;
   (b)  by facsimile at Merchant's fax number currently on file;
   (c)  by electronic mail at the Merchant's email address currently on file;
   (d)  by posting notice to the Merchant Portal, which shall be effective at the next Merchant login to the Merchant Portal.

(2)  To CHECK COMMERCE:
   (a)  by First Class Mail, return receipt requested to 5055 E. Washington Street, Suite 300, Phoenix, AZ 85034; or
   (b)  by email to legal@checkcommerce.com with a copy to Alex.Sidel@checkcommerce.com

**4.9  EXCLUSIVE AGREEMENT.**  Merchant agrees and warrants that, during the term of this Agreement, Merchant will exclusively use CHECK COMMERCE's products and services as set forth in this Agreement, and shall not use or contract with any competing ACH or electronic funds transfer organization unless first specifically approved in writing by CHECK COMMERCE.

**4.10  TERM AND TERMINATION.**  This Agreement is effective from the date hereof and shall continue for a term of one (1) year.  Thereafter, this Agreement shall be automatically renewed for consecutive one (1) year periods unless either party gives the other written notice of non-renewal at least 30 days prior to the expiration date of the current term.  This Agreement may be terminated by CHECK COMMERCE at any time with 30 days' written notice or as otherwise provided by the terms of this Agreement.  If Merchant wants to terminate the Agreement before the initial one-year term or any renewal term has expired, Merchant shall give CHECK COMMERCE 30 days' written notice of Merchant's intent to terminate the Agreement. CHECK COMMERCE must approve the Merchant's request for early termination in writing, which approval will not be unreasonably withheld. If CHECK COMMERCE does not provide such written approval, Merchant acknowledges and agrees that it will be charged an early termination fee of $500.00 or the amount mutually agreed upon in the Early Termination Fee section of the Agreement. Notwithstanding CHECK COMMERCE'S rights to cancel this Agreement as stated elsewhere in this Agreement, CHECK COMMERCE may also immediately terminate this Agreement and immediately suspend all processing for Merchant without providing advance written notice to Merchant: (1) upon the request of CHECK COMMERCE'S ODFI or any regulatory agency (regardless of the reason for the request); (2) if CHECK COMMERCE, its ODFI or any regulatory agency believes that Merchant has breached this Agreement, has breached any representations and warranties made in this Agreement, is violating or has previously violated any applicable Regulations or Rules and/or has initiated any unauthorized Entries; or (3) if CHECK COMMERCE is unable to process transactions for Merchant for any reason that is out of CHECK COMMERCE's control or CHECK COMMERCE no longer has the ability to process transactions for Merchant. Immediately upon termination of the Agreement, whether by expiration or otherwise and whether or not the Agreement was terminated for cause, CHECK COMMERCE'S obligation to provide services under the Agreement shall cease, and any unpaid amounts due and owing by Merchant shall become immediately due and payable.  Payment for any services rendered or any other obligation or liability owing at the time of termination shall not be affected by termination of this Agreement. At the time of termination, CHECK COMMERCE will place all unsettled funds due to be settled into a Reserve Account to be released in accordance with the RESERVE BALANCE paragraph of this Agreement.

**4.11  DAMAGE WAIVER.**  CHECK COMMERCE will not be liable to Merchant for any special, consequential, indirect or punitive damages whether or not: (1) any claim for these damages is based on tort or contract law, or (2) either party knew or should have known the likelihood of these damages in any situation.  CHECK COMMERCE makes no representations or warranties other than those expressly made in this Agreement.

**4.12  RESERVE ACCOUNT.**  For Merchants where Reserve Accounts are required, in CHECK COMMERCE's sole and absolute discretion, Merchant acknowledges and agrees that an amount equal to or greater than 100% percent of highest monthly origination total amount will be held in a Reserve Account by CHECK COMMERCE. Merchant further acknowledges and agrees that its Reserve Account may be commingled with reserve funds held for other merchants.  This amount will remain in the Reserve Account for a period of 2 years following the last debit Entry initiated by Merchant.  Merchant acknowledges and agrees that this Reserve Account will be used to fund any and all returned items.  In addition, CHECK COMMERCE shall also have the right to offset and pay itself from the Reserve Account for all returned Entries, fees, damages, or other costs and expenses (including attorneys' fees and costs) that may arise out of ACH processing for the Merchant and for which Merchant has agreed to pay CHECK COMMERCE pursuant to the terms of this Agreement.  For purposes of funding the Reserve Account, CHECK COMMERCE agrees to deduct an amount equal to no more than 100% percent of each debit origination until such time that the entire 100% percent reserve amount is reached.  In the event a reserve is held, it is solely the responsibility of Merchant to notify CHECK COMMERCE of an impending release based on the 2-year calculation.

Merchant acknowledges and agrees that, until such time as all of the amounts owed by Merchant and its obligations, including its obligation to pay all returns, are paid to CHECK COMMERCE in full, all funds in the Reserve Account shall be considered to be held by CHECK COMMERCE for CHECK COMMERCE  sole interest, benefit, and protection, shall be considered to be the property of CHECK COMMERCE, and shall not be considered to be held for the benefit of Merchant or be considered to be an asset for or property of Merchant. Notwithstanding any of the foregoing, as an additional and cumulative right under this Agreement, if CHECK COMMERCE reasonably believes that Merchant will in the future owe any such amounts under this Agreement, including for returns, anticipated returns, fines, fees, or any other item described in this Agreement, CHECK COMMERCE may also identify, sequester, segregate or transfer to itself (including its own bank account(s)) any portion of the Reserve that CHECK COMMERCE believes is needed to pay such obligation and may hold and use such amount for its own benefit and protection (as opposed to any such amount being held for Merchant's benefit or the benefit of any third party). Merchant shall not have any possessory or equitable interest in any funds



identified, sequestered, segregated or transferred pursuant to this Section. The aforementioned rights and remedies are not intended to be exclusive and are intended to be cumulative of all of CHECK COMMERCE'S other rights and remedies under this Agreement and applicable law.

In the event Merchant does not notify CHECK COMMERCE in writing for an accounting and request, in writing, that CHECK COMMERCE release any Reserve Account within 30 days prior to the expiration of the 2 years following the last debit transaction, the Reserve Account shall be forfeit and may be transferred or applied to a company-wide reserve account that may be used, applied or offset, in CHECK COMMERCE's sole and absolute discretion, to pay or reduce other unfunded liabilities of any and all CHECK COMMERCE merchants, whether or not affiliated with Merchant and Merchant's processing activity. Any funds held in accordance with the VOLUME ANALYSIS provisions of this Agreement are to be considered reserve funds and subject to the requirement of this paragraph that Merchant must request, in writing, that CHECK COMMERCE release funds in the Reserve Account within 30 days prior to the expiration of the 2-year period.  In the event of a forfeit Reserve Account, CHECK COMMERCE is granted all rights to the Reserve Account and the entire remaining balance therein.  Moreover, in the event the Agreement is terminated, suspended or canceled for any reason, any and all unfunded settlements otherwise due to Merchant will be placed in the Reserve Account and subject to the terms of this paragraph.

**4.13   FUNDING POLICY.**   Merchant acknowledges and agrees that funding for each origination will be set by CHECK COMMERCE at CHECK COMMERCE's sole and absolute discretion. Unless expressly agreed to in writing the amount disbursed will be the origination amount less returned items, processing fees and any reserve amount as required. WEB merchants are required to have an unfunded amount of no less than 12.5 percent of the highest consecutive 30-business day average. CHECK COMMERCE reserves the right to change the funding schedule, average balance requirements or reserve requirements at its sole and absolute discretion for any Merchant regardless of SEC type.

**4.14   AUDIT REQUIREMENTS.**   CHECK COMMERCE and its ODFI shall have the right to audit Merchant concerning its compliance with the Rules and applicable Regulations.

**4.15   CUSTOMER SERVICE.**   Merchant agrees to maintain, support and staff a customer service line with a U.S. domiciled telephone number during normal U.S. business hours. If Merchant fails to maintain a working customer service telephone line, then CHECK COMMERCE will, at its sole discretion, process customer services calls on behalf of Merchant at a charge of $5.00 per inbound/outbound call and $5.00 per refund processed.

**4.16   NON-SOLICITATION.**   Merchant agrees that, without CHECK COMMERCE's prior written consent, it will not, for a period of (1) year from the date this agreement is terminated, directly or indirectly solicit for employment or employ any person who is now employed by CHECK COMMERCE.

**4.17   ENTIRE AGREEMENT.**   This Agreement makes up the entire Agreement between the parties concerning ACH services and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions whether oral or written of the parties, and there are no warranties, representations and/or agreements among the parties in conjunction with the subject matter hereof except as set forth in this Agreement.  There are no third-party beneficiaries of this Agreement.

**4.18   SEVERABILITY.**   In the event any provision of this Agreement is held invalid, illegal or unenforceable by a court of competent jurisdiction, only that provision shall be severed from this Agreement and the remaining provisions shall continue in force, provided that each Party preserves the substantial benefits of the bargain contemplated in this Agreement.

**4.19   INTERPRETATION; WAIVER.**   Any waiver by a party of a breach by the other party, whether express or implied, shall not constitute a consent to, waiver of, or excuse for any different or subsequent breach. The parties agree that, should any provision or term of this Agreement require interpretation or construction, this Agreement will be interpreted or construed without any presumption that the provisions of this Agreement are to be construed against the party that prepared this Agreement.

**4.20   ASSIGNMENT.**   CHECK COMMERCE shall have the right to assign this Agreement, including its rights and performance obligations under the Agreement, to any corporation or other entity which CHECK COMMERCE may hereafter merge or consolidate, or to which CHECK COMMERCE may transfer all or substantially all of its assets provided such corporation or other entity assumes all of CHECK COMMERCE'S obligations hereunder. Upon assignee's or transferee's assumption of CHECK COMMERCE'S obligations pursuant to this Agreement, CHECK COMMERCE shall have no further liability to Merchant and Merchant shall look solely to any assignee or transferee for performance of any and all obligations arising under or related to this Agreement.

**4.21   EXECUTION IN COUNTERPARTS COPIES.**   This Agreement, including all Exhibits and Addendums thereto (which are incorporated as part hereof) may be executed in the original or by facsimile or e-mail in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Facsimile and photocopies of this Agreement shall be considered originals for all purposes, including, but not limited to, any court or arbitration proceedings. Merchant acknowledges that they may not receive a countersigned Agreement, exhibits or addendums from CHECK COMMERCE unless such countersigned Agreement is requested by Merchant in writing. Acceptance of all terms and conditions is upon CHECK COMMERCE's receipt of the agreement executed by Merchant.

**4.22   BINDING CONTRACT.**   This Agreement, which includes Schedule A, ACH Agreement Terms and Conditions, shall be binding on both parties only upon execution by an authorized representative of CHECK COMMERCE.



**5.0   PERSONAL GUARANTY.**   To endure and in consideration of CHECK COMMERCE's acceptance of the Merchant Application and this Agreement, the undersigned absolutely and unconditionally guarantees to CHECK COMMERCE full and prompt payment and performance when due of each any every condition and obligation of Merchant under this Application and Agreement, including all exhibits and amendments thereto.   The undersigned guarantor(s) further acknowledges and agrees to pay all expenses of collection on this guaranty, including reasonable attorneys' fees incurred by reason of the default of the Merchant or the default of the guarantor(s).  The undersigned guarantor(s) waives prior demand on Merchant.  CHECK COMMERCE shall not be required to first proceed against Merchant to enforce any other remedy before proceeding against the undersigned personal guarantor(s).  This is a continuing and irrevocable guaranty which shall not be discharged or affected by the death of the undersigned, shall bind heirs, administrators, representatives and assigns and may be enforced by or for the benefit of any other successor of CHECK COMMERCE.  The term of this personal guaranty shall be for the duration of the Agreement, and any other addendum or amendment thereto, and shall guarantee all obligations which may arise or accrue during the term thereof although enforcement may be sought subsequent to any termination.

| Merchant Name: | Merchant Name: |
|---|---|
| Authorized Signature: | Authorized Signature: |
| Name (Print or Type): | Name (Print or Type): |
| Title: | Title: |
| Date: | Date: |

Merchant acknowledges a countersigned Agreement, exhibits or addendums from CHECK COMMERCE may not be sent to Merchant or received by Merchant unless such countersigned Agreement is requested by Merchant in writing. Acceptance of all terms and conditions is upon CHECK COMMERCE's receipt of the Agreement executed by Merchant.

**CHECK COMMERCE:**

Authorized Signature:

Name (Print or Type):

Title:

Date:



| SCHEDULE - B:  BUSINESS QUESTIONNAIRE | | | |
|---|---|---|---|
| Year Business Established: | | Corporation    LLC    Partnership    Sole Proprietor    Other<br>Non-profit    Debit Only    Credit Only    Debit/Credit | |
| State Incorporated In: | Year Incorporated: | Business License Number: | Issued By: |
| Customer Service Telephone: | | Hours Available: | |
| Physical Street Address (if different than above): | | City: | State:    Zip Code: |
| Describe specific product or services the company offers for which the ACH services will be used:<br>(Attach copies of all sales scripts, marketing materials distributed to consumers, web pages, product samples [where applicable], and any other sales and marketing materials directed to consumers.) | | | |
| For Internet Merchants, please list all URLs for which the ACH services will be used. Include passwords for any "membership" type websites. | | | |
| How are authorizations received? (internet, telephone, etc) **Please indicate what percentage, be specific.**<br><br>_____% Internet /Web Authorization, WEB              _____% Check conversion by scanner, BOC<br>_____% Telephone/Tel Authorization, TEL              _____% Check conversion by scanner, ARC<br>_____% Written Authorization, in-person signature, PPD/CCD       _____% Check conversion by scanner, POP<br>_____% Written Authorization, faxed signatured, PPD/CCD       _____% Check conversion by scanner, RCK<br><br>**By signing this Application, Merchant agrees to send transactions using the authorization methods indicated above only. Merchant agrees to notify CHECK COMMERCE prior to initiating any entries utilizing any additional or different methods of receiving authorization for payment from customers.** | | | |
| What percentage of payments are from: Businesses: _____%   Consumers: _____% | | | |
| Have you received complaints from the Better Business Bureau, Attorney General, or similar organization?     Yes        No<br>**If yes, please attach a full explanation, including copies of complaints, dates, and disposition of all complaints.** | | | |
| Have you accepted ACH payments before?     Yes      No<br> Name of previous processor: | | | |
| Please include the following with your Application. If any items are not included, please provide a written explanation.<br>        A voided check for primary business account **(business name must be imprinted on check)** or attach a letter from the bank<br>        Copy of Driver's License or Passport<br>        Articles of Incorporation, LLC, or relevant business documents<br>        Most recent 3 months of credit card and/or ACH processing statements (if ACH transactions, include return rates and applicable return codes for all returned Entries within most recent 3 months)<br>        Please attach any relevant marketing materials and scripts, as described above | | | |



V10.10.19                ACH PROCESSING AGREEMENT        9

| **CERTIFICATE OF BENEFICIAL OWNER(S)** |||||
|---|---|---|---|---|
| To help the government fight financial crime, Federal regulation requires certain financial institutions to obtain, verify, and record information about the beneficial owners of legal entity customers. Legal entities can be abused to disguise involvement in terrorist financing, money laundering, tax evasion, corruption, fraud, and other financial crimes. Requiring the disclosure of key individuals who own or control a legal entity (i.e., the beneficial owners) helps law enforcement investigate and prosecute the crimes. |||||
| By signing this Application, I attest that I have accurately provided the name, address, date of birth, and Social Security Number (SSN) for the following individuals (i.e. the **beneficial owners**): |||||
| i)   Each individual, if any, who owns directly or indirectly, twenty-five (25) percent or more of the equity interests of the legal entity customer (e.g., each natural person that owns twenty-five (25) percent or more of the shares of a corporation); and |||||
| ii)   An individual with significant responsibility for managing the legal entity customer (e.g., a Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, or Treasurer). |||||
| The number of individuals that satisfy this definition of "beneficial owner" may vary. Under section (i), depending on the factual circumstances, up to four individuals (but as few as zero) may need to be identified. Regardless of the number of individuals under each section (i), you must provide the identifying information of one individual under section (ii). It is possible that in some circumstances the same individual must be identified under both sections (e.g., the President of Acme, Inc. who also holds a 30% equity interest). Thus, a completed form will contain the identifying information of at least one individual (under section (ii)), and up to five individuals (i.e., one individual under section (ii) and four twenty-five (25) percent equity holders under section (i)). |||||
| **Merchant Signature:** | **Printed Name:** || **Title:** | **Date:** |
| **CIP / LIST OF BENEFICIAL OWNERS HOLDING AN INTEREST OF 25% OR GREATER** |||||
| Owner/Officer Name: ||| Social Security Number: | Date of Birth: |
| % of Equity Ownership: | Residence Address: ||||
| Owner/Officer Name: ||| Social Security Number: | Date of Birth: |
| % of Equity Ownership: | Residence Address: ||||
| Owner/Officer Name: ||| Social Security Number: | Date of Birth: |
| % of Equity Ownership: | Residence Address: ||||
| Owner/Officer Name: ||| Social Security Number: | Date of Birth: |
| % of Equity Ownership: | Residence Address: ||||
| **IDENTIFY A SINGLE INDIVIDUAL WHO HAS A SIGNIFICANT RESPONSIBILITY TO CONTROL A MERCHANT**<br>(i.e. CEO, CFO, COO, MANAGING MEMBER, GENERAL PARTNER, PRESIDENT, VP, OR TREASURER) |||||
| Name: |||| Title: |
| Social Security Number: |||| Date of Birth: |
| Residence Address: |||||

