**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **FREEDOM FUNDING GROUP, INC.,** | |
| Plaintiff, | Civil Action No. 20-18404 (ZNQ) (DEA) |
| v. | **OPINION** |
| **THE FREEDOM FUNDINGGROUP L.L.C.** *agent of* THE FREEDOM FUNDING GROUP, *et al.*, | |
| Defendants. | |

**QURAISHI, District Judge**

      **THIS MATTER** comes before the Court upon a Motion to Dismiss by Defendant Gerald A. Firestone.  (ECF No. 42.)  Plaintiff Freedom Funding Group, Inc., filed opposition.  (ECF No. 45.)  Also before the Court is Plaintiff's unopposed Motion for Summary Judgment against Defendants Gerald A. Firestone and Lawrence Gordon (collectively, "Individual Defendants").  ("Motion," ECF No. 43.)  The Court has carefully considered the parties' submissions and decided the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.  For the reasons set forth below, the Court denies as moot Defendant Firestone's Motion to Dismiss and grants in part and denies in part Plaintiff's Motion for Summary Judgment.

## I.    **PROCEDURAL HISTORY**

On December 7, 2020, Plaintiff filed a Verified Complaint against Defendants The Freedom FundingGroup, LLC[1] ("Defendant Freedom"), Plaza Funding Group, LLC ("Defendant Plaza"), Gerald A. Firestone ("Defendant Firestone"), and Lawrence Gordon ("Defendant Gordon") (collectively, "Defendants") for violations of the Lanham Act and the Computer Fraud and Abuse Act, along with several state statutory and common law claims. (ECF No. 1.) [2]

On June 15, 2021, Defendants filed an Answer to Plaintiff's Complaint.  (ECF No. 25.)  At the time Defendants filed their Answer, they were represented by counsel. (ECF No. 28.)  On June 21, 2021, however, defense counsel asked the Court to withdraw from representing Defendants. (*Id.*)  The Court subsequently relieved counsel and ordered Defendants to "file a Substitution of Attorney with the Court no later than July 16, 2021."  (ECF No. 29.)  The Court cautioned Defendants that Plaintiff would be permitted to seek entry of default if Defendants failed to file a Substitution of Attorney within the allotted time.  (*Id.*)  Defendants failed to file a Substitution of Attorney by July 16, 2021.  (*Id.*)

Thereafter, the Court held a status conference on July 21, 2021, and directed the parties to file their respective dispositive motions by August 27, 2021.  (ECF No. 41.)  Defendant Firestone filed his Motion to Dismiss, and Plaintiff filed its Motion for Summary Judgment ("Motions"). (ECF Nos. 42, 43.)  Shortly after, the Court granted Plaintiff's Motion to Seal portions of the Motions.  (ECF Nos. 44, 46.)

On October 19, 2021, Plaintiff filed a request for the entry of default against Defendants. (ECF No. 50.)  However, because Defendants had filed an Answer while they were represented by

---

[1] The absence of a space between "Funding" and "Group" is the way Defendant Freedom's name appears in its registration documents on file with the State of New Jersey.  (Ex. A, Khachatryan Decl., ECF Nos. 43-7, 43-8).
[2] The Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

counsel, such default could not be entered.  (E CF No. 25.)  As such, Plaintiff instead filed a Motion for the Entry of Default to be considered by the Court.  (ECF No. 51.)  On November 11, 2021, the Court denied Plaintiff's motion without prejudice and instructed Plaintiff to first "file a Motion to Strike the Answers of the unrepresented corporate entities" for the Court's consideration before filing any request for default in this matter.  (ECF No. 53.)  Separately, on November 16, 2021, Defendant Gerald Firestone filed a letter with the Court writing "pro se" and "on behalf of [Defendant Freedom]" regarding the pending motions.  (ECF No. 54.)  Defendant Gerald Firestone did not address Plaintiff's previous motions for default or Defendants' failure to retain new counsel.  (*Id.*)

On November 24, 2021, Plaintiff filed a Motion to Strike the Answers of Defendants Freedom and Plaza Funding.  (ECF No. 55.)  On April 20, 2022, the Court granted Plaintiff's Motion to Strike the Answers, finding in part that "[w]ithout any appearance from counsel, Defendants [Freedom and Plaza could] no longer defend themselves in this matter as they [were] both unrepresented corporations."  (*Id.*)  The parties have since then taken no further action in this matter.  At this juncture, the Court will address Plaintiff's unopposed Motion for Summary Judgment.  (ECF No. 43.)

The Complaint contains the following counts against Defendants.  (Compl., ECF No. 1.)  Under Count One, Plaintiff claims that Defendants violated the Computer Fraud and Abuse Act, 18 U.S.C §§ 1030(a)(2)(C), 1030(a)(4) and 1030(b).  (*Id.* ¶¶ 70–75.)  Under Count Two, Plaintiff claims that Defendants violated the Lanham Act, 15 U.S.C. § 1125(a).  (*Id.* ¶¶ 76–84.)  Under Count Three, Plaintiff claims Defendants violated the Anti-cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d).  (*Id.* ¶¶ 85–90.)  Plaintiff also claims common law service mark infringement (Count Four), common law unfair competition (Count Five), tortious interference

with contract and prospective economic advantage (Count Eight), and common law conversion (Count Ten).  (*Id.* ¶¶ 91–98, 105–11, 117–22.)  Under Count Six, Plaintiff claims Defendants trafficked or attempted to traffic in counterfeit service marks in violation of N.J.S.A. § 56:3-13.16 (*id.* ¶¶ 99–101); under Count Seven, Plaintiff claims unfair competition in violation of the New Jersey Trade Secrets Act, N.J.S.A. § 56:4-1, *et seq.* (*id.* ¶¶ 102–04); and under Count Nine, Plaintiff claims Defendants misappropriated trade secrets in violation of N.J.S.A. § 56:15-1 (*id.* ¶¶ 112–16).

Plaintiff has submitted a Statement of Undisputed Material Facts that includes citations to declarations and relevant exhibits. (*See* ECF No. 43-2.)  Since Defendants have filed no response to the statement or the Motion for Summary Judgment despite having had ample opportunity to do so, the facts included in Movants' Statement of Undisputed Material Facts are deemed undisputed for the purposes of resolving this motion.  *See* L. Civ. R. 56.1.  The Court will, therefore, consider whether Plaintiff is entitled to judgment as a matter of law on all counts against the Individual Defendants.

However, before doing so, the Court notes that all counts contain group pleadings, referring to Defendants collectively and without addressing each Defendants' alleged actions individually. It is settled law that group pleadings are insufficient as a matter of law, but the Court will refer to the Individual Defendants insofar as they are factually associated with each count.  *See Pushkin v. Nussbaum*, Civ. No. 12-324, 2017 WL 1591863, at *7 (D.N.J. Apr. 28, 2017) (holding that a complaint referring to all defendants collectively is impermissible).

## II.   <u>BACKGROUND</u>

Plaintiff, a broker and syndicated lender, is licensed to conduct business across the country and has been operating since September 2017.  (Pl.'s Statement of Undisputed Material Facts

("SUMF") ¶¶ 2–3, ECF No. 43-2.)  Defendant Freedom is a limited liability company that was formed on October 23, 2020.  (*Id.* ¶ 4.)  Defendant Gordon is the sole member of Defendant Freedom.  (*Id.* ¶¶ 4, 7; Ex. A at 3, Khachatryan Decl., ECF No. 43-8.)  Defendant Plaza is a limited liability company that was formed on November 20, 2020.  (SUMF ¶ 5.)  Both Defendants Firestone and Gordon are members of Defendant Plaza.  (*Id.* ¶¶ 5–7; Ex. B at 3, Khachatryan Decl., ECF No. 43-9.)  Defendant Firestone is the registered agent for both Defendants Freedom and Plaza.  (SUMF ¶ 6; Ex. A at 2, Khachatryan Decl., ECF No. 43-8; Ex. B at 2, Khachatryan Decl., ECF No. 43-9.)

Plaintiff provides, among other services, loans to high-risk customers and loan consolidation.  (SUMF ¶ 8.)  A critical aspect of Plaintiff's business involves access to the automated clearing house ("ACH") Network in the United States.  (*Id.* ¶ 9.)  The ACH Network, which is operated by the National Automated Clearinghouse Association, processes credit and debit transactions in batches.  (*Id.*)  To fund loans, Plaintiff works with a lender, who in turn utilizes the ACH Network.  (*Id.* ¶ 10.)  This business relationship is critical because Plaintiff cannot receive approval or funding for loans without access to the ACH Network.  (*Id.*)

In addition, Plaintiff utilizes a service mark that resembles a white eagle imprinted upon a solid blue circle, followed by the words "Freedom" in black typeface and "Funding" in blue typeface (hereinafter, the "White Eagle service mark" or "mark").  (*Id.* ¶ 11.)  Plaintiff owns this mark and has been utilizing it in interstate commerce and on its website since about September 28, 2017.  (*Id.* ¶¶ 11, 32.)  The White Eagle service mark is an inherently distinctive trademark to both the public and the trade in connection with Plaintiff's services.  (*Id.* ¶¶ 14, 15.)  Plaintiff's mark serves primarily as a designator of origin of services originating from or sponsored or licensed by Plaintiff.  (*Id.*)  In addition, Plaintiff's customers associate the mark with Plaintiff's loan services.

(*Id.*)  The White Eagle service mark is a distinctive and well-known mark that is widely recognized by the public and the trade, and it has built up extensive goodwill.  (*Id.* ¶¶ 11, 15–16; Ex. C, Khachatryan Decl., ECF No. 43-10.)  Plaintiff's use of the White Eagle service mark has continued uninterrupted since 2017, and Plaintiff has never abandoned its use of the mark in connection with the services.  (*Id.* ¶ 13.)   Plaintiff possesses all rights, title, and interest in and to the White Eagle service mark based on the continuous use of the mark in the United States and worldwide commerce since 2017.  (SUMF ¶ 12.)

From 2017 to October 22, 2020, Defendants Firestone and Gordon were affiliated with Plaintiff as sales representatives and loan originators.  (SUMF ¶ 17.)  They were both independent contractors for Plaintiff and had been compensated as 1099 independent contractors since October 2017.  (*Id.*)  Defendants Gordon and Firestone at no time owned Plaintiff Freedom Funding Group, Inc., but were instead employees and independent contractors at different times during their tenure with Plaintiff.  (*Id.* ¶¶ 80–82.)

Prior to terminating their employment relationship with Plaintiff, Defendants Gordon and Firestone served as President and Vice President, respectively.  (*Id.*)   The Individual Defendants had unlimited access to Plaintiff's customer lists (including sensitive financial information, bank statements, loan applications, tax returns, and all of their contact information), confidential information, banking records and accounts, passwords along with secret questions and answers, account information for vendors, and marketing strategies.  (*Id.* ¶ 18.)

They worked for Plaintiff until October 22, 2020, when they voluntarily terminated their employment with Plaintiff through a telephone conversation.  (SUMF ¶ 19.)  The following day, on October 23, 2020, the Individual Defendants established Defendant Freedom—a limited liability company in New Jersey under the name "THE FREEDOM FUNDINGGROUP L.L.C."

(*Id.* ¶ 20.)  Defendant Firestone is the registered agent for Defendant Funding, and Defendant Gordon is listed as a member.  (*Id.*; Ex. A, Khachatryan Decl., ECF No. 43-8.)

After Defendants Gordon and Firestone stopped working for Plaintiff, they used Plaintiff's confidential and proprietary documents, including tax returns, to attempt to transfer Plaintiff's ACH account to their newly formed company.  (SUMF ¶ 21.)  They gained access to Plaintiff's tax returns by deceiving Plaintiff's accountant into emailing it to Defendants after they terminated their employment relationship with Plaintiff.  (*Id.* ¶ 22.)  The Individual Defendants also used confidential and proprietary information to contact Plaintiff's financial partners (*e.g.*, major banks that have the financial charters necessary to fund loans) in an attempt to move those relationships to Defendants' newly formed company.  (*Id.* ¶ 23.)  In the process, the Individual Defendants were able to redirect Plaintiff's relationship with its financial partner to themselves.  (*Id.*)

Around November 10, 2020, Plaintiff contacted Quicken, its main lender, and informed the company about Defendants' interference with Plaintiff's business.  (*Id.* ¶ 24.)  Quicken, wanting no part in this feud, froze Plaintiff's account.  (*Id.*)  This left Plaintiff with no access to the ACH Network, which resulted in Plaintiff's inability to originate or fund loans.  (*Id.*)  This brought Plaintiff's business operations to a halt.  (*Id.*)  Defendants' attempt to gain control of Plaintiff's clientele resulted in Plaintiff losing its Quicken loan portfolio valued at $570,000.  (*Id.* ¶ 79.)  Plaintiff derived income from servicing those loans, and Defendants' conduct resulted in an annual loss of at least $68,400 since October 2020.  (*Id.*)  Plaintiff has been unable to repair its relationship with Quicken, so the harm to Plaintiff has been ongoing.  (*Id.*)

Individual Defendants also attempted to redirect Plaintiff's banking relationships.  (*Id.* ¶ 25.)  Similarly, once Plaintiff informed the bankers about their actions, the bankers either suspended or terminated their relationship with Plaintiff.  (*Id.*)  As a direct consequence of

Defendant Gordon and Firestone's behavior, Plaintiff's revenue plummeted to zero given Plaintiff's inability to originate new loans and receive revenue from its partners. (*Id.*)

In addition, Plaintiff maintains a website located at www.freedomfundinggroup.org, which displays the White Eagle service mark. (*Id.* ¶ 11; Ex. C, Khachatryan Decl., ECF No. 43-10.) On or about November 12, 2020, Defendants began utilizing the domain name thefreedomfundinggroup.com. (SUMF ¶ 26.) This website is registered and owned by Defendant Gordon through Domains By Proxy, LLC, a company that provides domain name registration services. (*Id.* ¶¶ 26, 30.) Although the website appears to have gone live on or about November 12, 2020, the domain name was registered on February 9, 2020. (*Id.*) This website utilized the White Eagle service mark and looked very similar to Plaintiff's website. (*Id.*)

In addition, on November 18, 2020, the domain name plazafundinggroup.com was registered by Domain By Proxy, LLC. (SUMF ¶ 29.) This website also looked and felt like Plaintiff's website except it did not contain the White Eagle service mark. (*Id.* ¶¶ 29, 34.) The website, however, contained the same phone number as the number listed on Defendant Freedom's website. (*Id.* at 34.) In addition, the name "thefreedomfundinggroup" appeared in the title of the website, which is only visible when the website is printed. (*Id.*)

When Plaintiff initiated this action, Defendants still owned the domain names "thefreedomfundinggroup.com" and "plazafundinggroup.com," but neither site can be viewed on the Internet at this time. (*Id.*) The domain name thefreedomfundinggroup.com is no longer functioning, and Defendants have agreed—through a consent order dated December 23, 2020—to stop using this domain name or any similar names. (*Id.* ¶ 28; Ex. G, Khachatryan Decl., ECF No. 43-14; Ex. I, Khachatryan Decl., ECF No. 43-16.)

Plaintiff never gave Defendants the rights to Plaintiff's name, service mark, Internet domain name, copyright or other intellectual property, customer information, or any other content owned or attributable to Plaintiff. (SUMF ¶ 33.) Neither has Plaintiff authorized Defendants to access or use, copy or replicate Plaintiff's website. (*Id.*) Defendants used Domains By Proxy, LLC, to conceal their identity. (*Id.* ¶ 31.)

Defendants also transmitted fraudulent electronic communications to Plaintiff's customers and potential customers with the intent to deceive and trick them into providing sensitive information to Defendants or to poach their customers. (*Id.* ¶ 35.) From November 3, 2020 and November 27, 2020, the Individual Defendants used their SignNow account to attempt to trick Plaintiff's customers and potential customers into filling out a loan application for Defendant Freedom. (SUMF ¶ 41.) Defendants deceived at least five clients or prospective clients of Plaintiff into applying for financing services. (*Id.* ¶ 42.)

On December 31, 2021, Plaintiff served a subpoena on AirSlate, a reputable online electronic document vendor that operates under the trade name "SignNow" and is utilized by Plaintiff. (*Id.* ¶¶ 36, 43; Ex. K, Khachatryan Decl., ECF No. 43-18.) Plaintiff discovered that on November 3, 2020, Defendants had opened an electronic document signing account with AirSlate, and the account was linked to the following e-mail addresses: (1) info@thefreedomfundinggroup.com and (2) info@plazafundinggroup.com. (SUMF ¶ 37.) Both of these email addresses were utilized by the Defendants. (*Id.*; Ex. L, Khachatryan Decl., ECF No. 43-18.)

Defendants had also uploaded Plaintiff's loan application to AirSlate and modified it several times during November 2020. (*Id.* ¶ 38; Ex. L, Khachatryan Decl., ECF No. 43-19.) Plaintiff's loan application contained the following: Plaintiff's White Eagle service mark on the

upper-left-hand corner; Plaintiff's name ("Freedom Funding Group"), phone number, and main e-mail address on the upper-right-hand corner; and Plaintiff's full legal name ("Freedom Funding Group, Inc.") on the "Authorizations" section of the application. (SUMF ¶ 39; Ex. M, Khachatryan Decl., ECF No. 43-19.)

At some point, Defendants modified the loan application by removing the White Eagle service mark along with Plaintiff's name, e-mail address, and phone number at the top. (SUMF ¶ 40.) Defendants replaced the information instead with their credentials and contact information. (*Id.*; Ex. N, Khachatryan Decl., ECF No. 43-21; Ex. R, Khachatryan Decl., ECF No. 43-25; Ex. J, Khachatryan Decl., ECF No. 43-17.) One version of the application still contained Plaintiff's name at the "Authorizations" section of the application. (SUMF ¶ 40; Ex. L, Khachatryan Decl., ECF No. 43-19.)

Documents produced by AirSlate also showed that on November 19, 2020, Defendants uploaded a SignNow loan application for review and signature by Client 1. (SUMF ¶ 44.) Client 1 viewed the document several times and downloaded it. (*Id.*) The client's email address listed on the document history matches the e-mail address in Plaintiff's files. (*Id.*) In addition, Client 1 confirmed in writing that he received a phishing e-mail concerning the loan application from an e-mail account associated with Defendant Freedom. (*Id.* ¶¶ 44–45; Ex. O, Khachatryan Decl., ECF No. 43-22.) Client 1 downloaded and completed the loan application but never sent it to Defendants because he questioned its authenticity. (SUMF ¶ 46.) Plaintiff was able to inform Client 1 that the application did not come from Plaintiff. (*Id.*; Ex. L, Khachatryan Decl., ECF No. 43-19.) On November 19, 2020, Client 1 wrote an email to Plaintiff stating, "Also, received some document requesting statements again . . . ? I gave a year already." (*Id.*; Ex. L, Khachatryan Decl., ECF No. 43-19; Ex. O, Khachatryan Decl., ECF No. 43-19.)

On November 16, 2020, Defendants successfully spoofed Client 2 into signing a loan application with Defendants, but Nerses Khachatryan, the owner of Plaintiff Freedom Funding Group, Inc., contacted Client 2 and was able to advise the client that the loan application they received was not from Plaintiff.   (SUMF ¶ 47; Ex. L, Khachatryan Decl., ECF No. 43-19; Ex. P, Khachatryan Decl., ECF No. 43-19.)  The information on the loan application matches Plaintiff's records for Client 2.  (SUMF ¶ 47.)

On November 13, 2020, Defendants transmitted a loan application to Client 3, which the client viewed on the same day.  (*Id.* ¶ 48.)  The e-mail address listed in the SignNow document history matches the email address on file for Client 3.  (*Id.*)  Plaintiff had a pre-existing relationship with Client 3 because it had previously funded a $100,000 loan for the Client 3 in October 2019.  (*Id.*)  Plaintiff derived income from serving this loan.  (*Id.*; Ex. L, Khachatryan Decl., ECF No. 43-19; Ex. Q, Khachatryan Decl., ECF No. 43-24.)

On November 17, 2020, Defendants uploaded to SignNow a loan application to be signed by Client 4.  (*Id.* ¶ 49; Ex. L, Khachatryan Decl., ECF No. 43-19.)  On November 17, 2020, Client 4 downloaded the loan application and viewed it several days later.  (*Id.*)  The e-mail address on the document history matches the e-mail address Plaintiff has on file for Client 4.  (*Id.*)

In sum, Defendants sent a loan application to the said clients that was an exact replica of the Plaintiff's loan application except that Defendants replaced the credentials and contact information on the application.  (*Id.* ¶ 50.)  The e-mail address utilized on the loan application was info@thefreedomfundinggroup.com, which was the same address used in Defendants' phishing scheme.  (*Id.*)  Moreover, some of the loan applications still contained Plaintiff's name in the Authorization section.  (*Id.*; Exhibit N, Khachatryan Decl., ECF No. 43-21.)  Eventually, Plaintiff

convinced SignNow to suspend the account associated with info@thefreedomfundinggroup.com. (*Id.* ¶ 51.)

On November 11, 2020, Defendant Firestone directly solicited Client 5 by emailing the client from info@thefreedomfundinggroup.com.  (*Id.* ¶ 52.)  Firestone invited Client 5 to apply for a loan through the Defendant Freedom and attached a copy of pages from Defendants' spoofing website, which has since been shut down.   (*Id.*; Ex. R, Khachatryan Decl., ECF No. 43-25.)

In 2020, all five of these clients were either Plaintiff's customers or potential customers. (SUMF ¶ 53.)  Plaintiff never gave Defendants any right, license, or authority to contact these clients, solicit their business, or process loans on their behalf.  (*Id.*)  Defendants have been utilizing Plaintiff's confidential list of email addresses to solicit Plaintiff's customers.  (*Id.* ¶ 54.)  Plaintiff's list of email addresses contains approximately 100,000 emails, and this information is paired with critical customer information, such as when a customer's loan is up for renewal.  (*Id.*)

Although the original email list is commercially available through Meridian Leads, Plaintiff along with Defendants (when they worked for Plaintiff) reviewed and analyzed the information on the list to develop profitable leads.  (*Id.* ¶ 55.)  Plaintiff modifies the list based on work, experience, expertise in the field, and usage of the leads.  (*Id.* ¶ 58.)  The information regarding leads and potential customers cannot be replicated by anyone else because that information is collected and modified only by Plaintiff.  (*Id.*)  At all times relevant to this case, the customer leads received, as reviewed and analyzed by Plaintiff's proprietary process, were kept confidential.  (*Id.* ¶ 56.)  Plaintiff's customer lists and leads are not available anywhere else and are not shared with anyone else.  (*Id.* ¶ 57.)   The list of customers and potential customers is unique to Plaintiff's business, and Plaintiff relies on it to generate business.  (*Id.*)

Sometime after October 23, 2020, Gordon reached out to Meridian Leads and asked Meridian to send him the leads Plaintiff had previously purchased from Meridian. (*Id.* ¶ 59.) In November 2020, Gordon also attempted to trick Meridian into giving Plaintiff's leads to Defendants. (*Id.*; Ex. DD, Khachatryan Decl., ECF No. 43-37.) In addition, after Plaintiff initiated this action, on October 23, 2020, Gordon told Plaintiff's internet marketing platform (Fiverr) to stop transmitting leads they generated for Plaintiff and to email the leads to him instead. (SUMF ¶ 60; Ex. T, Khachatryan Decl., ECF No. 43-27.) Gordon told Fiverr to stop uploading the leads to Plaintiff's website and told Fiverr to not inform Plaintiff. (SUMF ¶ 60.) Gordon was ultimately able to divert all of the leads generated by Fiverr to himself. (*Id.*)

Defendant Gordon also created a list of Plaintiff's clients that he intended to solicit once he left. (SUMF ¶ 61.) Plaintiff's documents and information were stored on a shared Google drive, and both Plaintiff and Defendant Gordon had access to that drive. (*Id.*) The Google drive contained a spreadsheet entitled "Freedom Funding Group LLC," which was created by Defendant Gordon, and it contained the names, states, telephone numbers, email addresses, and loan amounts requested by seventeen of Plaintiff's clients. (*Id.* ¶ 62.) The spreadsheet was dated May 2019, which shows that Defendant Gordon contemplated leaving Plaintiff and taking some of its clients as far back as May 2019. (*Id.* ¶ 62; Ex. V, Khachatryan Decl., ECF No. 43-29.)

On November 10, 2020, Defendants took over Plaintiff's CheckCommerce account by changing the login and password. (SUMF ¶ 63.) They redirected the account to an email associated with Defendant Freedom, and Plaintiff was subsequently unable to regain control of the account. (*Id.*)

Defendants have also taken funds from Plaintiff. (*Id.* ¶ 64.) On or around August 5, 2020, Plaintiff received an Economic Injury Disaster Loan ("EIDL") in the amount of $150,000. (*Id.*

¶ 65.)  The interest rate on the loan is 3.75% per annum, and it began to accrue at the time the EIDL funds were received by Plaintiff.  (*Id.*)  The EIDL has a thirty-year term, monthly payments are $731.00, and the first payment was due in August 2021.  (*Id.*; Ex. W, Khachatryan Decl., ECF No. 43-30.)  The EIDL loan is secured by all of the property owned by Plaintiff.  (*Id.* ¶ 66.)  The EIDL agreement prohibits the use of EIDL funds by any person other than the borrower.  (*Id.* ¶ 67.)  Moreover, EIDL funds cannot be transferred to any other entity. (*Id.*; Ex. W, Khachatryan Decl., ECF No. 43-30; Ex. X, Khachatryan Decl., ECF No. 43-31.) The loan is not transferable and is not forgivable. (*Id.* ¶ 68; Ex. W, Ex. W, Khachatryan Decl., ECF No. 43-30.)  Defendant Firestone signed the Loan Authorization and Agreement while working for Plaintiff.  (SUMF ¶ 69.)  The Individual Defendants knew Plaintiff received the EIDL funds. (*Id.*)

Plaintiff kept the EIDL funds in Plaintiff's main operating account, which was almost completely depleted after Defendants' withdrawals.  (*Id.* ¶ 70.)  Almost as soon as the EIDL funds became available, Defendants Gordon and Firestone began transferring money out of Plaintiff's dedicated EIDL account and into their personal accounts.  (*Id.* ¶ 71.)  According to banking records, between August 7, 2020, and October 22, 2020, Defendant Firestone transferred or withdrew $30,533.00 of the EIDL funds to his personal account.  (*Id.* ¶¶ 72, 76; Ex. Y, Khachatryan Decl., ECF No. 43-32.)  Between September 1, 2020, and October 22, 2020, Defendant Gordon transferred or withdrew $71,972.95 of the EIDL funds to his personal account. (*Id.* ¶¶ 73, 76; Ex. Z, Khachatryan Decl., ECF No. 43-33.)

As a result of Defendants' conduct, Plaintiff has been damaged.  (SUMF ¶ 76.)  Defendants Gordon and Firestone lacked authority to utilize the EIDL funds to pay themselves; Defendants' authority was limited to utilizing those funds solely for the benefit of Plaintiff's business

operations.  (*Id.* ¶ 75.) Plaintiff never authorized Defendant Gordon and Firestone to make any withdrawals from the EIDL funds.  (*Id.* ¶¶ 74, 77–78.)

### III.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute is genuine if supported by evidence such that a reasonable jury could return a verdict in the non-movant's favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 251–52 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Kaucher v. County of Bucks*, 455 F.3d 418, 422–23 (3d Cir. 2006).  A fact is material if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  *Anderson*, 477 U.S. at 248; *Kaucher*, 455 F.3d at 423. In determining whether a genuine dispute of material fact exists, the Court must view the facts and all reasonable inferences drawn from those facts "in the light most favorable to the [non-movant]." *Matsushita*, 475 U.S. at 587–88.

A movant for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  *See In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) ("When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party.").  If the movant has shown an absence of material factual dispute, the non-movant then bears the burden

to "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).

Local Civil Rule 56.1 requires that a motion seeking summary judgment include a statement of material facts not in dispute and that an opponent of summary judgment shall file "a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion." L. Civ. R. 56.1(a). The rule further provides that "any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion." *Id. See Grant v. Revera Inc.*, Civ. No. 12-5857, 2014 WL 7341198, at *2 (D.N.J. Dec. 23, 2014) ("Where . . . a party fails to respond to the movant's statement of undisputed material facts . . . with a precise citation to the factual record where contrary evidence exists, then the Court assumes that the opponent has no evidence raising a genuine dispute with the movant's stated fact.").

Although a motion for summary judgment may not be granted by default merely because it goes unopposed, *Anchorage Assocs. v. V.I. Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir. 1990), the motion may be granted if the undisputed facts warrant judgment as a matter of law, *Miller v. Ashcroft*, 76 F. App'x 457, 462 (3d Cir. 2003); *Houston v. Twp. of Randolph*, 934 F. Supp. 2d 711, 723 (D.N.J. 2013), *aff'd*, 559 F. App'x 139 (3d Cir. 2014).

## IV.   **DISCUSSION**

### A.   Count One

Plaintiff claims that Defendants violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, because they intentionally and without authorization, or in excess of their authorization, accessed a protected computer—the computer server belonging to Plaintiff that

stored confidential and proprietary information and also the server of the financial institution by which Defendants transferred the IEDL funds to themselves—and they obtained information therefrom.  (Compl. ¶ 72.)  In addition, Plaintiff claims that "Defendants knowingly and with intent to defraud accessed or attempted to access the same protected computer(s) and by means of such conduct furthered that intended fraud and obtained things of value, namely Plaintiff's confidential customer information."  (*Id*. ¶ 73.)  Defendants used or attempted to use this confidential information to mislead Plaintiff's financial partners into believing that Defendants were still affiliated with Plaintiff.  (*Id.*)  Defendants' unauthorized access and ensuing conduct caused loss aggregating to at least $5,000 in value during a one-year period, including the cost of legal fees, the stolen EIDL funds, subsequent investigation, and remediation.  (*Id.* ¶ 74.)  Plaintiff seeks damages to be determined at trial and injunctive relief its "confidential information, its good will, and other legitimate business interests."  (*Id.* ¶ 75.)

"In broad strokes, the CFAA prohibits an individual from intentionally or knowingly accessing a protected computer, without authorization, to cause damage or commit fraud." *Buchanan v. Ingram Content Grp.*, Civ. No. 20-2421, 2021 WL 4199324, at *2 (D.N.J. Sept. 14, 2021) (citing 18 U.S.C. § 1030(a)).  Although the Act was originally a criminal statute, Congress amended the law to include a civil cause of action for certain violations.  18 U.S.C. § 1030(g) ("Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief.").

Such private action must involve one of the five factors set forth under 18 U.S.C. § 1030(c)(4)(A)(i), one of which is "loss to 1 or more persons during any 1-year period" that aggregates to at least $5,000 in value.  *See* 18 U.S.C. § 1030(c)(4)(A)(i)(I).  "Loss" is defined as

"any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).  Loss also encompasses the use of proprietary information.  *See P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 510 (3d Cir. 2005) ("Employers . . . are increasingly taking advantage of the CFAA's civil remedies to sue former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system." (quoting *Pac. Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1196 (E.D. Wash. 2003))).

Specifically, the CFAA prohibits intentional access to a computer without authorization or in excess of authorization to obtain "information from a protected computer."  18 U.S.C. § 1030(a)(2)(C).  The CFAA also penalizes a person who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value . . . ."  *Id.* § 1030(a)(4). Moreover, the CFAA also penalizes a person who "conspires to commit or attempts to commit an offense" under § 1030(a).  *Id.* § 1030(b).

The Court will first address Plaintiff's claims concerning the Individual Defendants' unauthorized access to Plaintiff's confidential and proprietary information, and then the Court will address their unauthorized transfer or withdrawal of funds.  As to the first cause of action, the Court finds that Plaintiff is not entitled to judgment as a matter of law as to the CFAA claims insofar as they relate to the unauthorized access to obtain Plaintiff's confidential customer information.  Plaintiff did not brief this cause of action under its argument section.  The Court notes that "it is the parties' duty, not the courts', to present legal authority and arguments in support

of a motion." *Hunt Optics & Imaging, Inc. v. Greene*, Civ. No. 10-503, 2010 WL 3303792, at *1 (W.D. Pa. Aug. 19, 2010).  Moreover, Federal Rule of Civil Procedure 56 "does not impose upon the district court a duty to sift through the record in search of evidence . . . ." *McCann v. Kennedy Univ. Hosp., Inc.*, 596 F. App'x 140, 146 (3d Cir. 2014) (citation omitted).  Accordingly, the Court finds that Plaintiff has failed to meet its initial responsibility of informing the Court of the basis for its motion.

As for Plaintiff's cause of action concerning the unauthorized transfer of money, the Court finds that Plaintiff is not entitled to judgment as a matter of law.  This cause of action is premised on Defendant Gordon and Defendant Firestone's unauthorized transfer and withdrawal of Plaintiff's EIDL funds.  (Compl. ¶¶ 71–73, 76; Ex. Y; Ex. Z.)  As discussed above, Plaintiff received the EIDL funds in August 2020, and Plaintiff kept the EIDL funds in Plaintiff's main operating account.  (SUMF ¶¶ 65, 70.)  The loan agreement prohibited use of EIDL funds by any person other than Plaintiff, and it also prohibited the transfer of such funds to any other entity.  (*Id.* ¶ 67.)  Defendants' authority was limited to utilizing those funds solely for the benefit of Plaintiff's business operations.  (SUMF ¶ 75; Moving Br. at 7, ECF No. 43-1.)

Under this cause of action, Plaintiff makes no arguments and points to no evidence in the record tending to show that all elements of its CFAA claims have been met.  Instead, Plaintiff simply states that Defendants' conduct resulted in a loss that exceeds the $5,000 statutory amount because Defendants transferred or withdrew a total of $102,505.95 of EIDL funds without authorization.  (Moving Br. at 7.)  After reviewing the evidence,  the Court finds that Plaintiff is not be entitled to judgment as a matter of law on these claims against Defendants Gordon and Firestone because Plaintiff has not suffered a cognizable "loss" or "damage" under the CFAA.

As discussed, "loss" refers to the reasonable cost of "responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Volpe v. Abacus Software Sys. Corp.*, Civ. No. 20-10108, 2021 WL 2451968, at *6 (D.N.J. June 16, 2021) (quoting 18 U.S.C. § 1030(e)(11)).  "Numerous district court decisions in the Third Circuit have held that to fall within this definition of 'loss,' the 'alleged loss must be related to the impairment or damage to a computer or computer system.'"  *Id.* (quoting *Sealord Holdings, Inc. v. Radler*, Civ. No. 11-6125, 2012 WL 707075, at *4 (E.D. Pa. Mar. 6, 2012)).  Therefore, compensable loss under the CFAA is either "the cost of remedial measures taken to investigate or repair the damage to the computer, or . . . the amount of lost revenue resulting from a plaintiff's inability to utilize the computer while it was inoperable because of a defendant's misfeasance."  *Id.* (citation omitted).  In other words, the loss must be "in some way related to functionality of the protected computer at issue."  *Id.* (citation omitted).  In addition, the CFAA defines damage as "any impairment to the integrity or availability of data, a program, a system, or information."  *Id.* at *7 (18 U.S.C. § 1030(e)(8)).  Plaintiff has failed to identify any loss stemming from the cost associated with responding to Defendants' conduct as contemplated under the CFAA.

In conclusion, the Court finds that Plaintiff is not entitled to judgment as a matter of law as to the CFAA claims against Defendants Gordon and Firestone.

B.      Counts Two, Four, Five, Six and Seven

Plaintiff brings unfair competition claims against Defendants Gordon and Firestone pursuant to the Lanham Act, 15 U.S.C. § 1125(a).  (Compl. ¶¶ 76–84.)  Plaintiff claims that Individual Defendants' use and promotion of the White Eagle service mark to identify their

services will likely or have likely caused confusion or mistake, or deceived as to the affiliation, connection or association of Plaintiff with Defendants.  (*Id.* ¶ 78.)  In addition, Plaintiff alleges that their use of the White Eagle service mark in interstate commerce and in connection with a website that mimics Plaintiff's website further enhances the likelihood of confusion among current customers and prospective customers.  (*Id.* ¶ 80.)  Plaintiff further alleges that their conduct represents an ongoing effort to induce the public to believe "that Defendants' website and the services represented thereby are rendered, sponsored, approved by or connected with Plaintiff."  (*Id.* ¶ 81.)  Moreover, Defendants knew of Plaintiff's rights regarding the White Eagle service mark and acted without Plaintiff's consent and with intent to deceive the public.  (*Id.* ¶¶ 82–83.)  As a result, Plaintiff claims that Defendant's use of the mark has caused and will cause harm to Plaintiff's name, reputation, and goodwill.  (*Id.* ¶ 84.)

Section 1125(a) provides a cause of action for trademark holders against persons or entities who, in connection with goods or services, use in commerce "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin" that "is likely to cause confusion . . . as to the origin, sponsorship, or approval" of the goods or services.  15 U.S.C. § 1125(a)(1).  To prove a claim for unfair competition under the Lanham Act, a plaintiff must show the following:

> (1) the mark at issue is valid and legally protectable; (2) the mark is owned by the plaintiff; (3) the defendant used the mark in commerce on or in connection with any goods or services or container for goods; and (4) this "use" was in a manner likely to create confusion concerning the origin of the goods or services.

*Buying For The Home, LLC v. Humble Abode, LLC*, 459 F. Supp. 2d 310, 318 (D.N.J. 2006).  As a general matter, confusion arises when the infringer uses the exact same mark as the one owned by a plaintiff.  *S & R Corp. v. Jiffy Lube Intern., Inc.*, 968 F.2d 371, 375 (3d Cir. 1992).  The

plaintiff bears the burden of proof.  *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).

First, the Court will consider whether the White Eagle service mark is valid and legally protectable and whether Plaintiff owns the service mark.  Where, as here, a service mark has not been federally registered, "validity depends on proof of secondary meaning, unless the unregistered mark is inherently distinctive."[3]  *Buying For The Home*, 459 F. Supp. 2d at 318 (quoting *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir. 1994)).  In evaluating the distinctiveness of a mark, the Court considers the following categories in ascending order of distinctiveness: "(1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Id.* (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).  "Marks that are suggestive, arbitrary, or fanciful are considered inherently distinctive and are entitled to protection." *Id.* (citing *Jews for Jesus v. Brodsky*, 993 F. Supp. 282, 296 (D.N.J. 1998)). "Suggestive marks require consumer 'imagination, thought, or perception' to determine what the product is,'" while "[a]rbitrary or fanciful marks use terms that neither describe nor suggest anything about the product; they 'bear no logical or suggestive relation to the actual characteristics of the goods.'" *See A & H Sportwear*, 237 F.3d at 221–22.

In contrast, marks that are not inherently distinctive are not entitled to protection unless it has attained a secondary meaning.  *Id.*  A secondary meaning is said to exist when the mark "is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services." *Commerce Nat'l Ins. Serv., Inc. v. Com. Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000) (quoting *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1228 (3d Cir.1978)).

---

[3]  Plaintiff's White Eagle service mark is unregistered.  (*See* Moving Br. at 9.)

Here, Plaintiff posits that the White Eagle service mark is valid and legally protected because it is arbitrary or suggestive rather than generic or descriptive.  (Moving Br. at 10–11.)  The Court agrees with Plaintiff.  The service mark consists of a stylized white eagle imprinted upon a blue circle, with the words "Freedom Funding" appearing adjacent to that image. (SUMF ¶ 11; Ex. C).  In the abstract, the image of a stylized white eagle has no connection to the origination of loans or mortgages.  The White Eagle service mark can be characterized as "arbitrary" or "fanciful" because it has no connection to bank loans or finance or the banking industry.  This particular mark cannot be said to suggest a connection to any industry or service.  Accordingly, the Court finds that Plaintiff's service mark is arbitrary or fanciful and is, therefore, inherently distinctive and entitled to protection.  Moreover, the Court finds that Plaintiff owns the service mark and has been utilizing it in interstate commerce since 2017.  (SUMF ¶¶ 11, 32.)

Next, the Court will consider whether Defendants' use was likely to create confusion concerning the origin of the goods or services.  "Proof of actual confusion is not necessary; likelihood of confusion is all that need be shown."  *Fisons Horticulture*, 30 F.3d at 472.  Marks "are confusingly similar if ordinary consumers would likely conclude that [the two] share a common source, affiliation, connection or sponsorship."  *A & H Sportswear, Inc., 237 F.3d at 216* (quoting *Fisons Horticulture*, 30 F.3d at 477).  Although courts may consider several factors[4] when assessing the likelihood of confusion, if "the trademark owner and the alleged infringer deal in

---

[4]  Where appropriate to the factual situation, a court may consider: "(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market." *A & H Sportswear*, 237 F.3d at 212 (citation omitted).

competing goods or services, the court need rarely look beyond the mark itself." *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983); *see also A & H Sportswear, Inc.*, 237 F.3d at 214 ("If products are directly competing, and the marks are clearly very similar, a district judge should feel free to consider only the similarity of the marks themselves."). The first and most important factor is "the degree of similarity between the owner's mark and the alleged infringing mark." *E.A. Sween Co., Inc. v. Deli Exp. of Tenafly, LLC*, 19 F. Supp. 3d 560, 569 (D.N.J. 2014). "Even if there is some difference between the marks, if the infringing mark appropriates the entire mark but adds a descriptive word, a likelihood of confusion may exist." *Cosm. Warriors Ltd. v. Nailush LLC*, Civ. No. 17-1475, 2017 WL 5157390, at *4 (D.N.J. Nov. 6, 2017).

Here, Plaintiff has shown that Defendant Gordon's use of the White Eagle mark caused a likelihood of confusion. At one point, Defendant Gordon appropriated Plaintiff's entire White Eagle service mark. Defendant Gordon registered a website with almost the same domain name as Plaintiff's website, and it included Plaintiff's service mark. (SUMF ¶¶ 26, 30.) Not only are the domain names almost identical, but according to the exhibits produced by Plaintiff, Defendant Gordon attempted to mimic Plaintiff's website and copied the White Eagle mark. (*Compare* Ex. C *with* Ex. H.) Notably, Defendant Gordon's website was registered in February 2020, and it went live shortly after the Individual Defendants terminated their employment relationship with Plaintiff. (SUMF ¶ 26; Exhibits F, G and H.) This is highly indicative of Defendant Gordon's intent to cause confusion, especially because Defendant Gordon knew Plaintiff actively used this mark in connection with its loan services since 2017. *See Dominion Bankshares Corp. v. Devon Holding Co.*, 690 F. Supp. 338, 347 (E.D. Pa. 1988) (finding that the "defendants use of the name is strongly suggestive of the intention of defendants to draw from that mark" where the record established that the defendants were aware of the plaintiff's existence and of plaintiff's use of the

name and service mark").  In addition, Defendants deal in competing services, and the parties'

sales efforts are the same.  Last, the parties market their loan service through the same channels of

trade and advertise through the same media—the Internet.

In sum, the Court finds that Defendant Gordon used Plaintiff's valid and legally protectable

White Eagle service mark in commerce and in connection with loan services in such a manner that

likely created confusion concerning the origin of the services.  "Because the elements of a claim

of unfair competition under the Lanham Act are the same as for claims of unfair competition and

trademark infringement under New Jersey statutory and common law, the Court's analysis [above]

extends to Plaintiff's state law claims as well."  *Buying For The Home*, 459 F. Supp. 2d at 317.

*See J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 374 (D.N.J. 2002) ("[T]he

elements for a claim for trademark infringement under the Lanham Act are the same as the

elements for a claim of unfair competition under the Lanham Act and for claims of trademark

infringement and unfair competition under New Jersey statutory and common law"); *Harlem

Wizards Entertainment Basketball, Inc. v. NBA Properties, Inc.*, 952 F. Supp. 1084, 1091 (D.N.J.

1997) ("N.J.S.A. 56:4-1 is the statutory equivalent of Section 43(a)(1) of the Lanham Act").

Accordingly, the Court finds that Plaintiff is entitled to judgment as a matter of law on the

following: Count Two (unfair competition pursuant the Lanham Act); Count Four (common law

service mark infringement); Count Five (common law unfair competition); Count Six (trademark

infringement pursuant to N.J.S.A. § 56:3-13.16); and Count Seven (unfair competition pursuant to

N.J.S.A. § 56:4-1).  The Court, however, grants Plaintiff's motion for summary judgment only as

to Defendant Gordon on these Counts.

The Court denies Plaintiff's motion for summary judgment as to Defendant Firestone on

these counts.  Plaintiff points to no evidence that shows Defendant Firestone was the infringer.

Plaintiff has the burden of proof at trial on these counts, and Plaintiff has not affirmatively shown that all essential elements are present. *In re Bressman*, 327 F.3d at 238. Plaintiff has failed to meet its burden of informing the Court of the basis for its motion on this claim against Defendant Firestone. *See Celotex*, 477 U.S. at 323.

      C.    <u>Count Three</u>

Plaintiff also claims that Defendants violated the Anti-cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d). (Compl. ¶¶ 85–90.) Plaintiff contends that Defendants have converted Plaintiff's domain name to their own use and created a website that is very similar to Plaintiff's website. (*Id.* ¶¶ 86–87.) Plaintiff alleges that Defendants registered, used, and trafficked in Plaintiff's domain name with the bad faith intention to profit from its registration and to draw members of the public to the website. (*Id.* ¶ 88.) Plaintiff seeks injunctive relief under this count. (*Id.* ¶ 90.)

"In general, cybersquatting is the act of registering, in bad faith and to garner profit, on the internet a domain name so similar to a distinctive mark that it is confusing." *Green v. Fornario*, 486 F.3d 100, 103 n. 5 (3d Cir. 2007). To succeed on an ACPA claim, Plaintiff must prove that: "(1) [plaintiff's] mark was distinctive or famous at the time defendants registered their domain name; (2) defendants' domain name is identical or confusingly similar to (or, if the mark is famous, dilutive of) plaintiff's mark; and (3) defendants registered the domain name with the bad faith intent to profit from the mark." *Carnivale v. Staub Design, LLC*, 700 F. Supp. 2d 660, 663 (D. Del. 2010) (citing *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001)). *See also* 15 U.S.C § 1125(d)(1)(A)(ii)(I).

First, the Court must determine whether Plaintiff's mark was a distinctive or famous mark at the time Defendants registered their domain name "www.thefreedomfundinggroup.com."

"'Distinctiveness' is a term of art in trademark law that describes terms or designations that are eligible for legal protection as 'marks.'" *Carnivale*, 700 F. Supp. 2d at 664. In contrast, a mark is famous "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). Under Section 1125(d)(1)(A)(ii)(I), the following factors may be considered in determining whether a mark is distinctive:

> (A) the degree of inherent or acquired distinctiveness of the mark; (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is used; (E) the channels of trade for the goods and services with which the mark is used; (F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought; and (G) the nature and extent of use of the same or similar mark by third parties.

*Shields*, 254 F.3d at 482.

Here, as determined above in connection with the service mark claims, Plaintiff's White Eagle service mark, which includes its name, is distinctive and has been associated with Plaintiff's loan services since 2017. (SUMF ¶¶ 11, 32.) The White Eagle mark appears on Plaintiff's website at www.freedomfundinggroup.org and on its loan application. (Ex. M and Ex. C). Defendant Gordon worked for Plaintiff and knew Plaintiff utilized the White Eagle service mark in connection with their business and loan services. Defendant Gordon began utilizing the White Eagle service mark and the domain name thefreedomfundinggroup.com around November 2020, shortly after he and Defendant Firestone terminated their employment relationship with Plaintiff. (SUMF ¶¶ 19, 26.) This website, which is now unavailable, was registered and owned by Defendant Gordon. (*Id.* ¶¶ 26, 30.) *See* 15 U.S.C. § 1125(d)(1)(c)(D) ("A person shall be liable

for using a domain name under subparagraph (A) only if that person is the domain name registrant or that registrant's authorized licensee.").

Next, the Court considers whether Defendant Gordon's domain name and mark is identical or confusingly similar to Plaintiff's mark. Plaintiff's "burden is not to produce evidence of actual confusion, but rather that there is the potential for confusion." *Pennsylvania State Univ. v. Parshall*, Civ. No. 19-1299, 2022 WL 2712051, at *20 (M.D. Pa. Feb. 17, 2022). *See Pennsylvania Bus. Bank v. Biz Bank Corp.*, 330 F. Supp. 2d 511, 525 (E.D. Pa. 2004) ("This prong relates to the nature of the domain name itself, not to the likelihood of confusion by consumers." (citing *Shields*, 254 F.3d at 483)). The Court finds that Defendants' domain name— www.thefreedomfundinggroup.com—was nearly identical and thus confusingly similar to Plaintiff's domain name—www.freedomfundinggroup.org.

Last, the Court considers whether Defendants registered the domain name with the bad faith intent to profit from the mark. When assessing the bad faith intent of the defendant to profit from the mark, the Court should consider the nonexclusive factors set forth under ACPA and "any other elements of bad faith."[5] *Carnivale*, 547 F. App'x at 116 (quoting *Advance Mag. Publishers*

---

[5] The nonexclusive factors set forth in the ACPA are: "(I) the trademark or other intellectual property rights of [the defendant], if any, in the domain name; (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names . . . ; and (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of § 1125(c)(1)." *Shields*, 254 F.3d at 485.

*Inc. v. Vogue Int'l*, 123 F. Supp. 2d 790, 799 (D.N.J. 2000)).  *See also Green v. Fornario*, 486 F.3d

100, 106 (3d Cir. 2007) ("applying the factors is a holistic, not mechanical exercise").

Here, the spoofing website displayed the distinctive White Eagle service mark and looked

very similar to Plaintiff's website.  Not only did Defendant Gordon's domain name closely

resemble Plaintiff's domain name, but the Defendant Gordon's website looked very similar to

Plaintiff's website.  (SUMF ¶ 27; *compare* Ex. C *with* Ex. H.)  In addition, based on the evidence

adduced by Plaintiff, Defendant Gordon did not make noncommercial, fair use of Plaintiff's mark.

Defendant Gordon clearly created this website in an attempt to divert Plaintiff's clients to

Defendant Freedom.  Defendant Gordon is the sole member of Defendant Freedom (SUMF ¶¶ 4,

7; Ex. A at 3, Khachatryan Decl., ECF No. 43-8.)  Notably, Defendant Gordon registered the

domain name in February 2020 while he and Defendant Firestone were still working for Plaintiff.

(SUMF ¶ 26; Ex. H.)  Moreover, it is telling that Defendant Gordon had been compiling a

spreadsheet of Plaintiff's clients before Defendants terminated their employment relationship with

Plaintiff.  (SUMF ¶ 62; Ex. V.) Accordingly, the Court finds that Defendant Gordon registered the

domain name in question with the bad faith intent to profit from Plaintiff's mark.

Plaintiff is entitled to judgment as a matter of law on its ACPA claim against Defendant

Gordon.  Plaintiff, however, is not entitled to judgment as a matter of law on the ACPA claim

against Defendant Firestone.  Plaintiff has not shown that Defendant Firestone is the domain name

registrant or the registrant's authorized licensee as required under 15 U.S.C. § 1125(d)(1)(c)(D).

With respect to Plaintiff's cause of action arising from Defendants' use of the domain name

plazafundinggroup.com, the Court finds that Plaintiff has failed to meet its initial responsibility of

informing the Court of the basis for its motion.  Plaintiff did not properly brief this issue.  As

previously noted, it is Plaintiff's duty to present legal authority and arguments in support of its motion. *Hunt Optics & Imaging*, 2010 WL 3303792, at *1.

      D.   <u>Count Eight</u>

Plaintiff claims that it "enjoys a reasonable expectation of economic advantage through [its] business relationships with its customers," and that those relationships were known to Defendants when they unreasonably interfered with those contractual relationships through the use of dishonest, unfair, or improper means. (Compl. ¶¶ 106–07.) Moreover, Plaintiff alleges that "Defendants unreasonably interfered with Plaintiff's pursuit of prospective economic advantage with its customers . . . ." (*Id.* at 108.) As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer damages. (*Id.* ¶¶ 107, 109–10.) Plaintiff alleges that Defendants acted with wanton and willful disregard of Plaintiff's legal rights. (*Id.* ¶ 111.)

In evaluating these claims, the Court applies the substantive law of New Jersey. *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 382 (3d Cir. 2016). To establish a claim for tortious interference in New Jersey, a plaintiff must establish:

> (1) that it had an existing contract or reasonable expectation of economic benefit or advantage; (2) that the defendant knew of the contract or expectancy; (3) that the defendant wrongfully interfered with that contract or expectancy; (4) that it is reasonably probable that the loss of the contract or prospective economic gain was a result of the interference; and (5) that damages resulted from the interference.

*Read v. Profeta*, 397 F. Supp. 3d 597, 641–42 (D.N.J. 2019) (quoting *Florian Greenhouse, Inc. v. Cardinal IG Corp.*, 11 F. Supp. 2d 521, 525 (D.N.J. 1998)). "An action for tortious interference with a prospective business relation protects the right 'to pursue one's business, calling or occupation free from undue influence or molestation.'" *Id.* at 641 (quoting *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 750 (1989)). "What is actionable is '[t]he luring

away, by devious, improper and unrighteous means, of the customer of another.'" *Id.* (quoting *Printing Mart-Morristown*, 116 N.J. at 750).

First, Plaintiff must show that it had a "protectable right." *Id.* at 642 (quoting *Printing Mart-Morristown*, 116 N.J. at 751). The protectable right need not arise from an existing contract but "there must be allegations of fact giving rise to some 'reasonable expectation of economic advantage'" or that the "plaintiff was in 'pursuit' of business." *Id.* (quoting *Printing Mart-Morristown*, 116 N.J. at 751). "Protectable economic expectations can arise from both existing and potential customers." *Avaya*, 838 F.3d at 382.

Second, Plaintiff must show malicious interference by Defendants. "Although the common meaning of malice connotes ill-will toward another person, '[m]alice in the legal sense is the intentional doing of a wrongful act without justification or excuse." *Printing Mart-Morristown*, 116 N.J. at 756 (citations omitted) (alteration in original). "Wrongful conduct, always viewed in the specific context of the case presented, is generally defined by reference to custom in the industry." *Avaya*, 838 F.3d at 383. "It is conduct that would not be sanctioned by the rules of the game." *Id.* (quoting *Printing Mart-Morristown*, 116 N.J. at 757). "[T]he line must be drawn where one competitor interferes with another's economic advantage through conduct which is fraudulent, dishonest, or illegal." *Id.* (quoting *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 282 N.J. Super. 140, 205–06 (App. Div. 1995)).

Third, "New Jersey law requires that a plaintiff alleging tortious interference with existing or prospective advantage present proof that *but for* the acts of the defendant, the plaintiff 'would have received the anticipated economic benefits.'" *Read*, 397 F. Supp. 3d at 642 (quoting *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1168 (3d Cir. 1993) (emphasis in original)). It "is sufficient that plaintiff prove facts which, in themselves or by the inferences which may be

legitimately drawn therefrom, would support a finding that, except for the tortious interference by

the defendant with the plaintiff's business relationship with [another party], plaintiff would have

consummated the sale and made a profit."  *Avaya*, 838 F.3d at 383 (alteration in original) (citation

omitted).

In *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 292–93 (2001), two employees collected

information on the plaintiff's clients with the purpose of using it to start their own business in

direct competition with the plaintiff.  The court explained that:

> [The defendants] gathered and used Lamorte's protected
> information to effect a surprise weekend coup, secretly soliciting
> Lamorte's clients at a time when Lamorte's knowledge of their
> competition was delayed, to put a best light on the tactic.  That
> confidential and proprietary information was provided to defendants
> only for the purpose of servicing clients on behalf of Lamorte, not
> to solicit those clients away from Lamorte.
>
> At the time of defendants' "weekend surprise," [the] plaintiff
> enjoyed a relationship with over thirty . . . clients.  Those clients
> were obtained on Lamorte's time and at its expense.  Lamorte's
> clients were then solicited and acquired by defendants' secretive
> taking of plaintiff's protected client information, and their ensuing
> strategically timed resignation and solicitation campaign.  Those
> acts clearly indicate malice. Defendants' conduct was not only
> unethical[] but also unlawful in that it constituted the wrongful
> taking of Lamorte's property.

*Id.* at 308.  The court held that the "taking of plaintiff's confidential and proprietary property and

then using it effectively to target plaintiff['s] clients, is contrary to the notion of free competition

that is fair."  *Id.* at 309.  *See also Avaya*, 838 F.3d at 384 ("[Defendant] was entitled to access [the

software] when it [worked for Avaya], but there is no reason it could expect that its access to

proprietary software and logins would survive when it struck out on its own to compete directly

against Avaya.").

Here, the Court finds that Plaintiff is entitled to judgment as a matter of law because Individual Defendants tortiously interfered with Plaintiff's prospective business advantage. First, Plaintiff had a protected interest in its client relationships and business relationships. *See Id.* at 382 ("Protectable economic expectations can arise from both existing and potential customers."). Moreover, Plaintiff relied on its business relationships to service loans and generate revenue from servicing those loans. It had a reasonable expectation of ongoing business with its financial partners and with its clients, who were the targets of the Individual Defendants' phishing expedition and website spoofing.

Second, both Defendants knew of Plaintiff's expectancy because they had previously worked for Plaintiff and developed these relationships on behalf of Plaintiff. Prior to terminating their employment relationship with Plaintiff, Defendants Gordon and Firestone served as Plaintiff's President and Vice President, respectively. (SUMF ¶ 17.) Both Defendants Firestone and Gordon had unlimited access to Plaintiff's customer lists, confidential information, banking records and accounts, passwords along with secret questions and answers, account information for vendors, and marketing strategies. (*Id.* ¶ 18.)

Third, Defendants wrongfully interfered with Plaintiff's expectancy. Defendants were entitled to use Plaintiff's proprietary information while they were working for Plaintiff, but they were not entitled to use that information when they left to become Plaintiff's competitors. Like in *Lamorte*, the Court finds that Defendants' actions clearly indicate malice. Defendants' conduct— including their use of Plaintiff's proprietary information, phishing expedition, and website spoofing—were fraudulent, dishonest, or otherwise contrary to the ethical standards of the loan industry. Plaintiff has identified at least five of its potential and current clients who received phishing emails from Defendant Freedom. (*Id.* ¶ 53.) For example, shortly after Defendant

Firestone stopped working for Plaintiff, he directly solicited one of Plaintiff's clients by emailing the client from info@thefreedomfundinggroup.com.   (*Id.* ¶ 52.)   Defendant Firestone invited Plaintiff's client to apply for a loan through the Defendant Freedom.   (*Id.*; Ex. R.)

Fourth, with respect to causation and loss, the evidence supports a conclusion that Plaintiff would not have lost its funding and clients but for Defendants' interference.   When Defendants interfered with Plaintiff's client and lending relationships, Quicken locked Plaintiff out of its accounts.  (SUMF ¶ 24.)   This left Plaintiff with no access to the ACH Network, which resulted in Plaintiff's inability to originate or fund loans.  (*Id.*)  This brought Plaintiff's business operations to a halt.  (*Id.*)  Moreover, Defendants attempted to redirect Plaintiff's banking relationships, which resulted in the banks either suspending or terminating their relationship with Plaintiff.  (*Id.* ¶ 25.) As a result, Plaintiff's revenue plummeted to zero because it was no longer able to originate new loans and receive accrued revenue from its partners.  (*Id.*)  Ultimately, Defendants' attempt to gain control of Plaintiff's clients resulted in Plaintiff losing its Quicken loan portfolio valued at $570,000.  (*Id.* ¶ 79.)   Plaintiff derived income from servicing those loans, and Defendants' conduct resulted in an annual loss of at least $68,400.  (*Id.*)  Plaintiff has been unable to repair its relationship with Quicken, so the harm to Plaintiff has been ongoing.  (*Id.*)

In conclusion, the Court finds that Plaintiff is entitled to judgment as a matter of law on the tortious interference claims against Defendants Gordon and Firestone.

E.    Count Nine

Plaintiff claims that Defendants misappropriated trade secrets in violation of the New Jersey Trade Secrets Act, N.J.S.A. § 56:15-1, *et seq.*  (Compl. ¶¶ 112–16.)  Plaintiff alleges that Defendants are in possession of and have used Plaintiff's trade secrets without permission to contract, solicit, and deceive Plaintiff's customers and potential customers.  (*Id.* ¶¶ 114–15.)

Plaintiff alleges that its customer lists, sensitive and confidential customer information, loan application forms and documents, business data compilations, methods, techniques, plans, and processes are trade secrets that derive independent economic value from not being generally available to others.  (*Id.* ¶ 113.)

The New Jersey Trade Secret Act prohibits the misappropriation or threatened misappropriation of a trade secret.  N.J.S.A. § 56:15–3.  A trade secret means information that: (1) derives "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use"; and (2) "that the holder reasonably endeavors to maintain as confidential." *Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*, 157 F. Supp. 3d 407, 423–24 (D.N.J. 2016) (quoting N.J.S.A. § 56:15-2).  "The party who asserts the trade secret bears the burden of proving that the information is a secret and not a matter of general knowledge in the industry." *OWAL, Inc. v. Caregility Corp.*, Civ. No. 21-13407, 2022 WL 890182, at *7 (D.N.J. Mar. 25, 2022) (citing *Rohm & Haas Co. v. Adco Chem. Co.*, 689 F.2d 424, 431 (3d Cir. 1982)).

Misappropriation includes: "(1) [a]cquisition of a trade secret of another by a person who knows or has reason to know that a person acquired the trade secret by improper means; *or* (2) [d]isclosure or use of a trade secret of another without express or implied consent of the trade secret owner . . . ." *Id.*; *see* N.J.S.A. § 56:15-2.  The disclosure is carried out by a person who:

> (a) Used improper means to acquire knowledge of the trade secret; or
>
> (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was derived or acquired through improper means; or
>
> (c) Before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired through improper means.

N.J.S.A. § 56:15-2(2).[6]   In other words, Plaintiff will succeed on its misappropriation claim if it proves that both Defendants Gordon and Firestone acquired, used, or disclosed Plaintiff's "trade secrets" without Plaintiff's consent and that they used improper means to acquire knowledge of Plaintiff's trade secrets.   Thus, the Court must determine whether the factual record supports a finding that (1) Plaintiff's information qualifies as trade secrets and that (2) Individual Defendants used improper means to acquire Plaintiff's trade secrets.   The Court will address each issue in turn.

The Court will first consider whether a trade secret exists.   *See Baxter Healthcare*, 157 F. Supp. 3d at 424.   The subject matter of a particular trade secret must be secret.   *Id.*   "In other words, matters of public knowledge or information completely disclosed by marketed goods cannot qualify as trade secrets."   *Id*. (cleaned up).   "The key to determining the misuse of information is the relationship of the parties at the time of disclosure and the intended use of the information."   *Lamorte*, 167 N.J. at 299 (citation omitted).   In this case, the Court finds that Plaintiff's customer lists and information qualify as trade secrets.   Although Plaintiff purchases leads, it develops the list by building relationships with potential customers, removing bad leads from the list, and identifying qualified ones.   (SUMF ¶¶ 55, 58.)   The information regarding leads and potential customers is not available to anyone else because that information is collected and modified only by Plaintiff.   (*Id.* ¶ 58.)   It is unique to Plaintiff's business, and Plaintiff relies on it to generate business.   (*Id.* ¶ 57.)   In addition, this information remains confidential and has been securely kept by Plaintiff.   (*Id.* ¶¶ 54, 56–57.)   Accordingly, the Court finds that Plaintiff derives "independent economic value" from this information not being generally available to others "who can obtain

---

[6] "Improper means . . . include theft, fraud, unauthorized interception of communications, inducement of or knowing participation in a breach of confidence, and other means either wrongful in themselves or wrongful under the circumstances of the case."   *Avaya*, 838 F.3d at 387 (cleaned up).

economic value from its disclosure or use" and that Plaintiff reasonably endeavors to maintain this information confidential. *Baxter Healthcare*, 157 F. Supp. 3d at 423.

Next, the Court will consider the alleged misappropriation of Plaintiff's trade secrets. Here, Defendant Gordon attempted to mislead Plaintiff's lead generator into sending Defendants copies of Plaintiff's leads to him after he had stopped working for Plaintiff.  On October 23, 2020, Defendant Gordon asked Plaintiff's internet marketing platform (Fiverr) to stop transmitting leads they generated for Plaintiff and to email the leads to him instead.  (*Id.* ¶ 60; Ex. T; Ex. U.) Defendant Gordon was ultimately able to divert leads generated by Fiverr to himself.  (*Id.*)

In addition, Defendant Gordon also created a list of Plaintiff's clients that he intended to solicit once he left Plaintiff's employ.  (SUMF ¶ 61.)  Plaintiff's shared Google drive contained a spreadsheet entitled "Freedom Funding Group LLC.  (*Id.* ¶ 62.)  The document was created by Defendant Gordon, and it contained the names, states, telephone numbers, email addresses, and loan amounts requested by seventeen of Plaintiff's clients.  (*Id.*)  The spreadsheet was dated May 2019, which shows that Defendant Gordon contemplated leaving Plaintiff and taking some of its clients as far back as May 2019.  (*Id.* ¶ 62; Ex. V.)

Accordingly, the Court finds that Defendant Gordon disclosed or used Plaintiff's trade secret without consent and obtained such information through improper means.  *See* N.J.S.A. § 56:15-2(2)(a).  As for Plaintiff's claim against Defendant Firestone, the Court finds that he used Plaintiff's client information after acquiring it through improper means either by himself or through Defendant Gordon.  Defendant Firestone subsequently used such information to solicit Plaintiff's customers through phishing emails (as described ealier) and to compete with Plaintiff. The Court, therefore, finds that Plaintiff is entitled to judgment as a matter of law on these claims against Defendants Gordon and Firestone.

F.      Count Ten

Plaintiff also asserts conversion claims against Defendants for wrongfully exercising dominion and control over the EIDL funds, which belonged to Plaintiff.  (Compl. ¶¶ 117–22.)

"In New Jersey, conversion is defined as 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Read*, 397 F. Supp. 3d at 640 (citation omitted). The elements of common law conversion are: "(1) the existence of property, (2) the right to immediate possession thereof belonging to plaintiff, and (3) the wrongful interference with that right by defendant." *Corestar Int'l Pte. Ltd. v. LPB Commc'ns, Inc.*, 513 F. Supp. 2d 107, 127 (D.N.J. 2007); *Torsiello v. Strobeck*, 955 F. Supp. 2d 300, 312 (D.N.J. 2013).

"The New Jersey Appellate Division made clear that in order to establish conversion, the money converted 'must have belonged to the injured party.'" *Scholes Elec. & Commc'ns, Inc. v. Fraser*, Civ. No. 04-3898, 2006 WL 1644920, at *5 (D.N.J. June 14, 2006) (quoting *Advanced Enters. Recycling, Inc. v. Bercaw*, 376 N.J. Super. 153, 161 (App. Div. 2005)).  When money, as opposed to tangible property, is the subject of a conversion claim, the "plaintiff must show that the money in question was identifiably the plaintiff's property . . . ." *Id.*

Here, Defendants took EIDL funds from Plaintiff's account.  (SUMF ¶ 64.)  As explained above, Plaintiff received this loan in August 2020, and the EIDL agreement specifically prohibited the use of EIDL funds by any person other than Plaintiff, the borrower.  (*Id.* ¶¶ 65–67.)  It also prohibited transfer of the EIDL funds to other entities. (*Id.*; Ex. W; Ex. X.)  Both Defendants knew Plaintiff received the EIDL funds.  (SUMF. ¶ 69.)  In fact, Defendant Firestone signed the Loan Authorization and Agreement while working for Plaintiff.  (*Id.*)  Defendants Gordon and Firestone lacked authority to utilize the EIDL funds to pay themselves; their authority was limited to utilizing

those funds solely for the benefit of Plaintiff's business operations.  (*Id.* ¶ 75.)  Plaintiff never authorized Gordon and Firestone to make any withdrawals from the EIDL funds.  (*Id.* ¶¶ 74, 77–78.)

However, almost as soon as the EIDL funds became available, Defendants Gordon and Firestone began transferring or withdrawing money out of Plaintiff's dedicated EIDL account and into their personal accounts.  (*Id.* ¶ 71.)  According to banking records provided by Plaintiff, Defendant Firestone transferred or withdrew $30,533.00 of the EIDL funds, and Defendant Gordon transferred or withdrew $71,972.95 of the EIDL funds into their personal accounts.  (*Id.* ¶¶ 72–73, 76; Ex. Y; Ex. Z.)  Plaintiff has established that Defendants wrongfully interfered with Plaintiff's right to immediate possession of the EIDL funds through Defendants' unauthorized transfer or withdrawal of the funds.  Plaintiff is entitled to judgment as a matter of law on the conversion claims against Defendants Gordon and Firestone.

G.    Relief

Plaintiff seeks injunctive relief and monetary damages. The Court will address each one in turn.  Plaintiff seeks to enjoin Defendants from (1) using the White Eagle service mark; (2) using in trade any service mark that is confusing or likely to be confused with Plaintiff's service mark; (3) utilizing certain domain names; (4) prohibiting Defendants from utilizing in commerce or any other fashion Plaintiff's proprietary trade secrets, including any leads or customer information generated by Plaintiff on or before October 23, 2020.  (Moving Br. at 22; Compl. ¶¶ A, C.)

A party seeking permanent injunctive relief must show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; 3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*E.A. Sween Co. v. Deli Exp. of Tenafly, LLC*, 19 F. Supp. 3d 560, 576 (D.N.J. 2014).  The Lanham Act and ACPA both allow plaintiff to seek permanent injunctive relief to prevent or restrain trademark infringement and cybersquatting.  *See* 15 U.S.C. § 1116(a) (courts "shall have power to grant injunctions . . . to prevent a violation under subsection (a), (c), or (d) of section 1125").  N.J.S.A. § 56:4-2, which governs the state unfair competition claim, also entitles a plaintiff to injunctive relief.

The Court finds that Plaintiff has suffered irreparable injury.  Not only has Plaintiff's trade secrets been compromised, but Defendants have interfered with Plaintiff's business relationships.  In addition, Defendant Gordon used Plaintiff's service mark and created a website in an attempt to divert Plaintiff's clients to his newly formed company.  *See* 15 U.S.C. § 1116(a) ("A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction").  The Court agrees with Plaintiff that monetary damages is an inadequate remedy for Plaintiff's harm to its reputation, business, and client relationships.  The Court likewise agrees that there is no hardship to Defendants because they have already consented to entry of an order prohibiting them from interfering with Plaintiff's business.  (ECF No. 12.)  Moreover, there is no cost or hardship associated with restraining the Individual Defendants from engaging in such conduct.  Finally, it is in the public interest to grant injunctive relief in this instance.  Having already established that there is a likelihood of consumer confusion created by Defendant Gordon's unfair competition and use of the Plaintiff's service mark, it follows that the public interest would be damaged if Defendant Gordon were to use it in the future.  *See E.A. Sween*, 19 F. Supp. 3d at 577 ("There is certainly a public interest in a truthful and accurate marketplace, while there is no public interest served by consumer confusion.").  The same logic follows for Defendant Gordon's

violation of ACPA, and the Individual Defendants' tortious interference with Plaintiff's business relationships and misappropriation of trade secrets.

With respect to the conversion claims, the Court will enter judgment against Defendant Gordon in the amount of $71,972.95 and against Defendant Firestone in the amount of $30,533.00. To the extent Plaintiff seeks other damages, such as punitive damages, attorney fees, and costs, the Court directs Plaintiff to fully brief the issue. The Court will, therefore, order supplemental briefing on the issue of damages pursuant to its "inherent power to control its docket so as to promote fair and efficient adjudication." *Rolo v. Gen. Dev. Corp.*, 949 F.2d 695, 702 (3d Cir. 1991).

As for Plaintiff's arguments concerning Defendant Gordon and Firestone's counterclaims and third-party claims, the Court denies Plaintiff's request. Plaintiff did not properly brief this issue, and it is Plaintiff's duty to present legal authority in support of its motion. *Hunt Optics & Imaging*, 2010 WL 3303792, at *1.[7]

## V. <u>CONCLUSION</u>

For the reasons stated above, the Court denies as moot Defendant Firestone's Motion to Dismiss and grants in part and denies in part Plaintiff's Motion for Summary Judgment. An appropriate Order will follow.


Date: **August 25, 2022**

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

---

[7] Without citing to legal authority, Plaintiff argues that this Court should dismiss Defendant Gordon and Firestone's counterclaims and third-party claims because "this court no longer has diversity jurisdiction." (Moving Br. at 24–26.) The Court notes that it is exercising federal question jurisdiction over this matter, not diversity.